**In re Sharon Ann SMITH, Debtor.**

**In re Willie C. WASHINGTON, Jr. and Gwendolyn D. Washington, Debtors.**

**In re Gary W. ABSHIRE, Debtor.**

**Bankruptcy Nos. BK–95–15031–LN, BK–95–15939–LN and BK–95–16562–LN.**

United States Bankruptcy Court, W.D. Oklahoma.

Feb. 23, 1996.

John W. Mee, III, Truman E. Coe, Oklahoma City, Oklahoma, for Memorial Bank.

Kenneth C. McCoy, Oklahoma City, Oklahoma, for Debtors.

Letha Sweeney, Oklahoma City, Oklahoma, for Chapter 13 Trustee.

## ORDER DENYING CONFIRMATION TO CHAPTER 13 PLANS

PAUL B. LINDSEY, Chief Judge.

### BACKGROUND

In each of these cases, Memorial Bank, Oklahoma City, Oklahoma (hereafter, "Bank"), is a secured creditor with a perfected security interest in a vehicle which debtors seek to retain by making payments under a plan proposed under Chapter 13 of the Bankruptcy Code.[1] In each case, it is proposed that interest on secured claims be paid at a rate of 8.0% per annum. In each case, Bank has objected to confirmation of the

---

1. References herein to statutory provisions by section number only will be to provisions of the Bankruptcy Code, 11 U.S.C. §§ 101–1330, incl., unless the context indicates otherwise. Chapter 13 consists of §§ 1301–1330, incl.

2. Under § 506(a), an allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of the collateral, and is an unsecured claim to the extent that the amount of the claim exceeds the value of the collateral.

proposed plan, contending that the proposed plan does not comply with § 1325(a)(5)(B)(ii).

Section 1325 contains requirements for confirmation of a Chapter 13 plan. Section 1325(a)(5) provides, with respect to an allowed secured claim provided for by the plan, that unless (A) the holder of the claim has accepted the plan, or (C) the debtor surrenders the property securing the claim to the holder, (B)(i) the plan must provide that the holder of the claim retain the lien securing the claim and (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of the claim is not less than the allowed amount of the claim.

Virtually all Chapter 13 plans provide for periodic payments by debtors to the Chapter 13 trustee, over a period of not less than 36 months, from which the trustee takes a fee and remits the balance to creditors in accordance with provisions of the plan. Thus, the provisions of § 1325(a)(5)(B)(ii) require the determination of the appropriate discount rate to be applied to the total amount to be paid on the secured claim over the life of the plan, or the appropriate rate of interest to be applied to the allowed amount of the secured claim, in order to insure that the amount to be paid over the life of the plan has a value, as of the effective date of the plan, at least equal to the allowed amount of the secured claim.

The allowed amount of the secured claim is an amount equal to the value of the collateral securing the claim; i.e., the value of the vehicle in each of these cases.[2] In instances where the value of the collateral is less than the allowed amount of the creditor's claim, debtor must provide § 1325(a)(5)(B)(ii) protection to the creditor only to the extent of the allowed amount of the creditor's secured claim, the balance of the claim being allowed, but only as an unsecured claim.[3] The effect

---

3. Based upon Bank's proofs of claim and stipulations of the parties as to the value of the collateral, Bank is undersecured as to debtors Smith and Washington and oversecured as to debtor Abshire. Thus, as to debtors Smith and Washington, Bank has both a secured and an unsecured claim, while as to debtor Abshire, Bank's entire claim is secured.

of this treatment of the holders of such claims is commonly referred to, particularly by creditors affected by it, as "cramdown."

Since it is not required under Chapter 13 that debtors pay unsecured claims in full, and since such claims frequently receive no payment whatever, holders of secured claims may receive less than the full amount of their claims. Even in cases where the plan provides for payment of 100% of unsecured claims, payments on such claims are usually made without interest, and only after administrative, secured and priority claims have been paid in full. Thus, holders of such claims are rarely compensated for the time value of the money represented by the unsecured portion of their claims.

A hearing was held before this court on the issue of confirmation of debtors' plans, and on Bank's objection thereto. At the hearing, the parties presented certain stipulations of fact. Bank presented the testimony of Bank's Assistant Vice President in charge of its Collections Department, who opined that the current market rate of interest on loans such as those of debtors was between 19% and 21%, a rate equal to the contract rate in each of the cases.[4] Debtors presented no evidence. Counsel for debtors, however, cross-examined Bank's witness and argued that the fact of bankruptcy, with the debtor being protected from collection efforts by other creditors by the automatic stay of § 362(a), should make debtors a better credit risk during the pendency of the case than would be true outside of bankruptcy.

At the conclusion of the hearing, the court indicated that it was considering the appointment of an expert witness, as is permitted by Rule 706, Fed.R.Evid. Neither Bank nor debtors interposed any objection to such an appointment. The court gave the parties time to submit nominations for appointment, and to submit suggested criteria to govern the court in identifying an appropriate per-

son. Within the prescribed time, Bank submitted the name of a proposed appointee and its suggested criteria. Debtors made no submission, of either a proposed nominee or of suggested criteria.

The court has reviewed the submission of Bank, and has made inquiries of its own in this connection, but has reconsidered the appointment of an expert witness. Upon reconsideration, this court has concluded that an expert witness would be of only limited assistance to the court in reaching its decision, and that other considerations militate against such an appointment in these cases. Thus, the court will decide the issues before it upon existing evidence and authorities.

### THE AUTHORITIES

Any examination of this issue in the Tenth Circuit necessarily begins with *Hardzog v. Federal Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858 (10th Cir.1990). In that case, the bankruptcy court had determined the appropriate rate of interest under a Chapter 12 plan by determining the creditor bank's cost of funds, and adding a risk factor.[5] On appeal, the district court affirmed. On further appeal, the court of appeals reversed. The *Hardzog* court cited *United States v. Doud*, 869 F.2d 1144 (8th Cir.1989), in which the court endorsed a market rate approach, but approved a method of determination which began with "market cost," the rate which would be charged on a risk-free loan, then added a two percent risk factor. The *Hardzog* court noted that while that approach was a simplified method of determination, it did not agree that the result represented a market rate of interest, and was concerned that it might unduly penalize either the borrower or the lender in a particular case. The *Hardzog* court continued:

> Courts are not well situated to craft and determine interest rates. Judges are neither bankers nor lenders and do not have

---

4. The contract rate of interest in these cases is 21% as to debtors Smith and Washington and 19.25% as to debtor Abshire. The evidence indicates that 21% is the maximum rate which may be charged under Oklahoma law on automobile financing.

5. Although *Hardzog* involved a case under Chapter 12, it is noted that § 1225(a)(5)(B)(ii), under which that case was decided, was derived from and is virtually identical to § 1325(a)(5)(B)(ii), and that the decided cases have uniformly concluded that *Hardzog* should be equally applicable in Chapter 13 cases. *See, e.g., In re Mellema*, 124 B.R. 103 (Bankr.D.Colo.1991).

the expertise to set interest rates. A lender, in establishing interest rates to be charged to a borrower, will consider and utilize many factors, including what the competition charges, its cost of funds, the condition of the local economy, its overhead, the character of the borrower, the capacity of the borrower to repay, the value of the collateral, the costs of servicing the loan, the status of the lender's loan portfolio, the lender's ratio of loans to assets, its liquidity, and a host of other factors. We therefore hold that a "cost of funds" approach should not be utilized by Bankruptcy Courts in establishing the appropriate interest factor. A "cost of funds" approach is not susceptible of accurate determination without complex problems of proof and may not result in fairness.

Considering that most courts are utilizing a market rate approach and further considering that courts are well equipped to determine market rates, we hold that in the absence of special circumstances, such as the market rate being higher than the contract rate, [footnote omitted] Bankruptcy Courts should use the current market rate of interest used for similar loans in the region. Bankruptcy Courts, counsel, lenders, and borrowers should have a familiarity with current interest rates on like-type loans and when a dispute arises, the market rate should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for similar loans in the region....

*Hardzog,* 901 F.2d at 860.

It is noted that the use of the current market rate of interest was also required in Chapter 13 cases in an earlier court of appeals decision. *See Memphis Bank & Trust Company v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982).

In the footnote omitted from the foregoing excerpt from *Hardzog,* the court deliberately reserved until the issue is properly before it

a definition of the parameters of the term "such special circumstances." It appears, however, from the use of the term in the opinion, that its definition may be expected to encompass an exception to the required use of the market rate when that rate is found to be higher than the contract rate, at least in cases where the creditor is oversecured.[6]

*General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3rd Cir.1993), involved a claim secured by a vehicle, in which debtor sought to retain the vehicle and pay the undersecured creditor an amount equal to the value of the vehicle with interest during the term of a Chapter 13 "cramdown" plan. The *Jones* court reviews numerous authorities, and adopts the "coerced loan" approach contained in what it describes as the better reasoned cases, including *Whitman, Hardzog* and *Mellema.* The court then notes that the *Whitman, Hardzog,* and other courts had determined the appropriate interest rate to be equal to the interest rates of similar loans in the region, without regard to the identity of the lender. It further notes, and states its agreement with, the decision of the court in *Mellema,* and others, in which it was determined that the appropriate rate was that charged on similar loans by the particular creditor which was being coerced to extend the loan to the creditor by the Chapter 13 plan. The *Jones* court recognizes that this rate would not differ materially from those charged by competing creditors. It states, however, that if a creditor was permitted to receive interest at a rate equal to the rate it would charge in the regular course of its business in the region for loans of similar character, amount and duration, the creditor would be placed more nearly in the same position which it would have occupied had it been able to repossess the collateral at the time of bankruptcy. After further discussion of the "coerced loan" approach employed by numerous courts in determining the appropriate interest rate, the *Jones* court states the following:

---

**6.** In *Hardzog,* the creditor was oversecured, a fact which the *Hardzog* court considered impor-

tant. *Hardzog,* 901 F.2d at 859 n. 5.

In sum, because the effect of the instant cramdowns was to force GMAC to extend loans to appellees for the duration of the plans, we hold that the appropriate interest rate under § 1325(a)(5)(B)(ii) is the interest rate that GMAC would charge, at the time of the effective date of the plans, for a loan of similar character, amount and duration.

*Jones,* 999 F.2d at 70.

Next, the *Jones* court finds that while the passage of time may have seen a material increase or decrease in lending rates, the contract rate, the rate which was voluntarily agreed to by the parties to the transaction in the first instance, was a fair place for the court to start in its determination of the appropriate rate under a Chapter 13 plan. The court continues as follows:

> In the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its current rate is in excess of the contract rate. [Footnote omitted.] Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate. [Footnote omitted.]

*Jones,* 999 F.2d at 70–71.

In the footnotes omitted from the foregoing excerpt, the *Jones* court first declines to follow some courts, including *Mellema,* which have adopted the contract rate as a cap on the appropriate interest rate. The *Jones* court states that it believes that imposing such a cap would be inconsistent with the coerced loan theory. Whether such a cap should be imposed where the creditor is not undersecured, and therefore has not had its expectations frustrated by the bifurcation of its claim under § 506(a), was not before the court, and therefore it took no position on that issue. *Jones,* 999 F.2d at 71 nn. 11, 12.

The *Jones* court holds that the bankruptcy and district courts erred in utilizing the prime rate in determining whether the proposed plan of the debtor complied with § 1325(a)(5)(B)(ii), and reverses and remands, concluding its opinion with the following:

> The appropriate interest rate for this purpose is the rate of interest currently being charged by the creditor in the regular course of its business for loans similar in character, amount and duration to the loan being coerced in the cramdown. It is further appropriate, we hold, for a bankruptcy court to treat the contract rate as a proxy for the creditor's current rate in the absence of a stipulation or evidence to the contrary....

*Jones,* 999 F.2d at 71.

### THE EVIDENCE

The testimony of Bank's Assistant Vice President indicated that Bank had originally been involved in what he referred to as "standard" automobile lending, but that the larger banks had effectively taken over that segment of the business. Bank then found its niche in "special" automobile financing, which is limited to high risk loans, and that Bank now has a special financing portfolio of between $15,000,000 and $17,000,000. The witness indicated that a profit margin of three to five percent is necessary in its special financing portfolio, due to "astronomically higher" default rates, and that Bank's default rate on its portfolio was now some 20%, compared to an approximate 30% industry average.

The witness testified with regard to several of the factors taken into account in "underwriting" a potential loan. It was indicated that competitors in the special automobile financing business charge between 19% and 21%, and that 21% is the maximum rate allowed under Oklahoma law. It was indicated that these loans were made, as almost all special automobile financing loans are made, indirectly and with no direct contact between Bank and the borrower, based upon written applications obtained and submitted by automobile dealers, and upon credit reports ob-

tained by Bank. The borrower's capacity to repay is evaluated based upon job and credit history and other particulars of the written application. The witness also testified that there had been no appreciable change in the local economy since these loans were made (in March and May of 1995), that the cost of federal funds to Bank was approximately 6.5%, that Bank's overhead was viewed as reasonable, and that it had not been criticized by the FDIC or other regulatory body.

As has been noted above, debtors presented no evidence, their presentations being limited to cross-examination of Bank's witness and closing argument.

## DISCUSSION AND DECISION

In requiring that the contract rate be the starting point in determination of an appropriate interest rate under § 1325(a)(5)(B)(ii), the *Jones* court observed that this additional rule of practice would be consistent with the statutory objective and would reduce litigation expenses. *Jones*, 999 F.2d at 70.

That court's discussion and analysis of the issue before it is compelling, and is in all respects consistent with *Hardzog*. The requirement that the market rate be the rate currently charged on like loans by the particular creditor which originally extended the credit and which will be required to extend the credit under the Chapter 13 plan is not inconsistent with *Hardzog*, but is simply a logical and entirely appropriate extension of the rule of that case. In any event, as the *Jones* court observed, there will seldom be any material difference between the rate charged by the directly affected creditor and its competitors in the marketplace of the region.

Finally, the additional rule of practice requiring that the inquiry begin with the contract rate is not only logical and consistent with the statutory objective, but undoubtedly will reduce the amount of litigation in this area. In this case, the presence of that additional rule of practice would have made the bulk of the testimony adduced by Bank

unnecessary, since it merely sought to establish that the contract rate was the appropriate market rate in these cases.[7]

It makes little sense, absent a substantial change in market rates, to permit a debtor in bankruptcy to obtain confirmation of a cramdown Chapter 13 plan which provides for interest at a rate 13% below the best rate the debtor could obtain outside of bankruptcy a short time earlier in the open marketplace of the region. As has been often observed, in many contexts, bankruptcy promises honest but unfortunate debtors a fresh start, not a head start.

■ Based upon the foregoing, this court adopts the practices and procedures set out in and required by *Jones*. Based upon the evidence and argument presented to this court, it is found and concluded that the market rate of interest required to be provided in order to comply with *Hardzog*, and with § 1325(a)(5)(B)(ii), is in each of these cases the contract rate of interest; 21% per annum as to debtors Smith and Washington and 19.25% per annum as to debtor Abshire. Inasmuch as debtors' proposed Chapter 13 plans provide an interest rate in each case of only 8% per annum, § 1325(a)(5)(B)(ii) is not complied with and the proposed plans may not be confirmed. The objection of Bank to confirmation of the proposed plans in each of these cases will therefore be sustained.

Debtors will be given 20 days from the date hereof within which to propose amendments to their respective plans to render them not inconsistent with this opinion. Should debtors in any of these cases fail to do so, or to file notice of conversion of their case to a case under Chapter 7, within such time, the Chapter 13 trustee is directed to prepare and submit to the court, *ex parte*, an order dismissing the case.

■ The ruling and procedures contained and provided for herein shall be in force and effect as to any Chapter 13 case in which a plan has not heretofore been confirmed. They shall not constitute a ground for recon-

7. Although it was not altogether clear from the evidence, this court assumes that Bank intended to urge that the appropriate rate in each of these cases was the contract rate, and not that 21% was appropriate in all three cases. As is noted above, the contract rate as to debtor Abshire was 19.25%.

sideration in cases in which plans have been confirmed which would not have been in compliance with this ruling. The decision of the court herein prescribes the method of determining to what a secured creditor is entitled under § 1325(a)(5)(B)(ii). It is not intended to limit in any way the right of any creditor to voluntarily agree to accept a lesser amount if it elects to do so.

IT IS SO ORDERED.