**In re SEGURA, Tordur Walter and Segura, Erla Hardardottir, Debtors.**

**Bankruptcy No. 97–03289–R.**

United States Bankruptcy Court, N.D. Oklahoma.

March 5, 1998.

---

Robert A. Todd, Tulsa, OK, for Debtor.

Jack A. Martin, Tulsa, OK, for Creditor.

## MEMORANDUM OPINION AND ORDER

DANA L. RASURE, Chief Judge.

### Procedural History

Debtors, Tordur Walter and Erla Hardardottir Segura ("Debtors"), filed their petition for relief under chapter 13 of the Bankruptcy Code on July 17, 1997, and on the same day filed their proposed Chapter 13 Plan (the "Plan"). On July 28, 1997, secured creditor WFS Financial, Inc. ("WFS") Filed its Objection to Chapter 13 Plan (the "Objection to Confirmation") and its Motion for Adequate Protection (the "Motion"). On August 6, 1997, Debtors filed Debtors' Objection to Motion for Adequate Protection filed by WFS Financial and Request for Hearing. On August 12, 1997, creditor Ocwen Federal Bank filed its Objection to Chapter 13 Plan ("Ocwen's Objection") contesting the amount of the mortgage arrearage owed to it as reflected in the Plan. On August 29, 1997, Debtors filed Debtors' Response to WFS Financial, Inc.'s Objection to Chapter 13 Plan.

A hearing to consider the Motion and confirmation of the Plan was held on September 3 and 5, 1997. Debtors appeared in person and through their counsel, Robert A. Todd, and WFS appeared through its branch manager, Charles Baccus, and through its counsel, Jack A. Martin. Lonnie Eck appeared as the chapter 13 trustee. Debtors represented that they would amend the Plan to resolve Ocwen's Objection; to resolve WFS's Motion, the parties agreed to the entry of an order granting a lien to WFS on funds held by the chapter 13 trustee pending confirmation as adequate protection. The Court then heard testimony of witnesses, admitted exhibits, and entertained oral argument regarding WFS's Objection to Confirmation. Upon conclusion of the hearing, the Court took the matter under advisement. Following the hearing, Debtors and WFS submitted supplemental briefs.

### Contentions of the Parties

In their Plan, Debtors placed a value of $9,187.50 on WFS's collateral, a 1995 Jeep Cherokee (the "Vehicle"), and proposed to pay that amount to WFS over forty-eight months, with interest at 10%. WFS objected to Debtors' valuation and proposed interest rate, claiming that the value of the Vehicle was at least $11,875.59 (the amount Debtors owed WFS according to WFS's Proof of Claim) and that the contract rate of 21% (and not the Plan's rate of 10%) was the rate of interest that would provide WFS with the present value of its allowed secured claim as required by Section 1325(a)(5) of the Bankruptcy Code. Prior to the hearing, the parties stipulated that the value of the Vehicle was

$11,900, rendering WFS fully secured. The only contested issue is what rate of interest is required to render the Plan confirmable under Section 1325(a)(5).

At the hearing and in post-hearing briefs, WFS also argued that the Plan should not be confirmed because the bankruptcy was filed in bad faith in light of the fact that it was commenced just seven months after the Vehicle was purchased.

**Findings of Fact**

On December 9, 1996, Debtor husband purchased the Vehicle from a Tulsa automobile dealer for the purchase price of $17,659 by making a $1,500 down payment, trading in a vehicle for a $4,200 credit, and financing $11,959 of the purchase price. Debtors were in desperate need of a reliable vehicle; their only vehicle had become undrivable, and Debtor husband needed transportation in order to remain employed. Because Debtors' credit history was poor (Debtors had previously obtained a chapter 7 discharge in 1993), they felt that they were not in a position to negotiate favorable financing terms. The automobile dealer obtained financing for Debtor husband through WFS, and Debtor husband executed an installment sales contract in the original principal amount of $11,959, with interest at 21%, resulting in sixty monthly payments of $326.36. Debtors' first payment was due on January 23, 1997. Debtors made the monthly payments through June 1997. This case was commenced in July 1997. A wage deduction order which deducts $525 from Debtor husband's paycheck each month is in place.

WFS is a lender that finances used automobile purchases for "high risk" borrowers. Borrowers' applications are referred to WFS by automobile dealers who determine, through credit histories reflected on applications taken by the dealers and through credit reports, that a borrower is a "high risk" borrower. WFS compensates a dealer who refers a borrower by paying the dealer one to three percent of the amount of the original loan. A dealer is motivated to refer a borrower to the lender that will pay the highest percentage for the referral. No evidence was presented regarding the amount WFS paid to the dealer who referred Debtor husband to WFS.

In the northeastern Oklahoma area, WFS receives referrals from 60 to 70 automobile dealers. In this area, WFS rarely finances installment contracts at less than 21%; only 5% of those contracts reflect a rate of less than 21% interest. WFS branch manager, Charles Baccus, testified that in determining the interest rate it will charge a particular borrower, WFS evaluates the collateral, the loan to value ratio, the borrower's credit report, and the borrower's income and payment history. Mr. Baccus testified that the maximum legal rate for this type of loan is 21%, however. Mr. Baccus determined that Debtor husband fit within the profile for "high risk" high interest rate lending; although Debtor husband had a stable job at American Airlines, his credit history, which contained a prior bankruptcy and prior defaults on loans, predicted a "high risk" of default.

The Court admitted WFS's Exhibit 7, entitled "Branch Cobra Summary Report," dated August 29, 1997, which, in relevant part, contained loan and contract statistics for its "Southwestern Division." The exhibit was divided into the "Northern" and "Southern" regions of the Southwestern Division, and into specific "areas" within each region, which were defined by city names. The only two "areas" located in the State of Oklahoma were Tulsa and Oklahoma City. The Court cannot determine from the exhibit or from testimony, the perimeter of the Tulsa area, and therefore the market area is largely undefined. However, for lack of more particular information, the statistics appear to be the best evidence of a relevant market area. For the purposes of this discussion, the Court refers only to the Tulsa area statistics.

According to the exhibit and sponsoring testimony, as of August 29, 1997, WFS had entered into approximately 800 installment sales contracts with interest rates at or near 21% in the Tulsa area in 1997. Eighty-one of the contracts were entered into during the month of August 1997. Of those eighty-one contracts, the average "coupon rate" of interest, i.e., interest charged to the borrower, was 20.09%. However, after deducting the

amount paid by WFS to dealers to compensate them for their services in referring borrowers to WFS (which cost is passed on to the borrowers), WFS's actual average interest rate in the Tulsa area was 19.2%. The "delinquency rate" was listed at 3.6%, however, again, the testimony did not develop the meaning of the term "delinquency rate" or what such rate means in terms of the actual rate of return to the lender.

As their evidence of prevailing interest rates applicable to car loans in the area, Debtors offered and the Court admitted as exhibits five advertisements contained in the *Tulsa World*, Tulsa's daily newspaper. In these August 1997 ads, automobile dealers marketed interest rates of 0.0%, 0.9%, 2.9%, 3.9%, 5.9% and 7.75% for new vehicle loans [1] and 10.9% for used vehicle loans. One credit union ad touted an 8.4% "preferred rate" for used auto loans. Such advertising, like most advertising, is designed to entice buyers to visit the dealer's place of business; the ads likely reflect the best-case scenario for the most creditworthy car buyers who qualify for such low interest financing under criteria not defined in the ads. No evidence was offered that any loan was actually made at such advertised interest rates. In addition, some of the more conscientious advertisements contained conditional language which limited such interest rate offers to those with "approved credit," an ambiguous condition not explained in the advertisements or in testimony. Two of the advertisements indicated that "Special Credit" was also available; the Court assumes that "Special Credit" refers to credit made available to less creditworthy buyers by referring them to higher risk lenders.

Debtors also offered the testimony of Billy Ritchie, a certified appraiser, regarding his opinion as to the average interest rate for used automobile financing. Mr. Ritchie testified that in his experience as an appraiser, he observed that most used car loan interest rates fall between 8.5% and 12%, that someone with poor credit could obtain a 12% rate from some banks, and that the average inter-

est rate was 10%. Mr. Ritchie admitted that his experience as an appraiser typically put him in contact with people with good credit histories, however. The breadth of Mr. Ritchie's knowledge did not encompass "high risk" borrowers, nor did Mr. Ritchie have experience in lending or risk evaluation. Further, Mr. Ritchie's knowledge and experience was limited to Tulsa's neighboring towns of Claremore and Catoosa. He stated that he primarily dealt with Claremore and Catoosa banks, as well as NationsBank, which he defined as a "national bank."

### Analysis and Conclusions of Law

#### a. Bad faith

■ The only fact relied upon by WFS to support its contention that Debtors filed their bankruptcy in bad faith was the alleged proximity in time of the bankruptcy filing to Debtor husband's purchase of the Vehicle and financing through WFS. The evidence indicates that approximately seven months elapsed between the date WFS extended credit to Debtor husband and the date Debtors filed their chapter 13 bankruptcy petition. During that time, Debtors made all installment payments due to WFS except for the payment due immediately prior to filing. No evidence was presented to indicate that Debtors had any intention to file bankruptcy when the loan was obtained from WFS or that they filed solely to modify WFS's rights. Moreover, since WFS is fully secured, its rights are not significantly prejudiced by the bankruptcy.

■ To determine good faith, a court must look at the "totality of the circumstances," guided by the eleven factors set forth in *Flygare v. Boulden*, 709 F.2d 1344, 1347–48 (10th Cir.1983), and other relevant circumstances. *See Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 667–68 (10th Cir. 1993). WFS did not present evidence on the *Flygare* factors. "[A] party who refers to an issue 'in passing and fails to press it by supporting it with pertinent authority or by showing why it is sound despite the lack of supporting authority, forfeits the point.'"

---

1. The vendors offering low interest rates also offered in the alternative a substantial rebate, indicating that the vehicles were priced in such a

way as to support such extraordinary financing terms.

*Robinson,* 987 F.2d at 668, *quoting Nunez–Pena v. INS,* 956 F.2d 223, 225 n.4 (10th Cir.1992).

WFS's bad faith argument appears to be an after-thought; it was not developed by the evidence or argument in a meaningful way. The Court concludes that the evidence presented failed to demonstrate that Debtors did not propose their Plan in "good faith" as contemplated by Section 1325(a)(3) of the Bankruptcy Code and as the term has been interpreted by the Tenth Circuit Court of Appeals.

**b. Valuation**

The Court finds, pursuant to the stipulation of the parties, that the value of the Vehicle at the time of the hearing was $11,900 and that the debt owed to WFS at the commencement of this case was $11,875.59; consequently, WFS is fully secured.

**c. Interest rate**

The Court must begin its inquiry with the language of the statute which creates the obligation of Debtors to pay interest to WFS on the amount of its allowed secured claim. Section 1325(a)(5) provides that in order for the Court to confirm a plan—

> with respect to each allowed secured claim provided for by the plan—
>
> (A) the holder of such claim has accepted the plan;
>
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim

is not less than the allowed amount of such claim; or

> (C) the debtor surrenders the property securing such claim to such holder....

11 U.S.C. § 1325(a)(5). WFS has not accepted the Plan, and Debtors do not wish to surrender the Vehicle. Therefore the Plan must comply with subsection (a)(5)(B), which is colloquially referred to as the "cramdown" provision.[2] The Plan proposes that WFS retain its lien on Vehicle and that the trustee make payments to WFS over forty-eight months in the amount of $233.02, which, Debtors claim, will provide WFS with the present value of its allowed secured claim of $11,875.59. WFS disagrees. The sole issue, then, is what "discount rate" would insure that the stream of payments to be made to WFS, when totaled, equal the present value of WFS's allowed secured claim.

The Tenth Circuit Court of Appeals was one of the first appellate courts to address this issue. *Hardzog v. Federal Land Bank (In re Hardzog),* 901 F.2d 858 (10th Cir.1990), requires courts in this Circuit to examine "the current market rate for similar loans made in the region at the time the new loan is made" to determine the appropriate interest or discount rate for the purposes of a cramdown of a secured creditor in a reorganization. *Id.* at 860.[3] This determination is not as mechanical as it first appears. This Court must determine, as threshold matters, the perimeter of the relevant region to consider, what the term "similar loan" means, and the definition and breadth of the "market" from which a current rate should be elicited. The Court must also take into consideration that a "new loan" is being made, albeit unwillingly, by the lender, which means that the relevant date for determining

2. Although the parties stipulated that WFS was fully secured at the time of the hearing, the stipulated amount does not include any equity cushion that would hedge against depreciation of the Vehicle. Therefore, the risk of depreciation attendant with a lack of an equity cushion justifies WFS's rejection of the Plan and compels Debtors to invoke the "cramdown" provision.

3. Although *Hardzog* was a chapter 12 reorganization, courts have uniformly considered *Hardzog* applicable in chapter 13 cases. *See, e.g., In re Smith,* 192 B.R. 563, 565 n.5 (Bankr.W.D.Okla.

1996); *In re Mellema,* 124 B.R. 103 (Bankr. D.Colo.1991). Further, the Tenth Circuit recognized that there may be "special circumstances" that render the current market rate inequitable, such as when the market rate is higher than the contract rate agreed to between the lender and the debtor. *See Hardzog,* 901 F.2d at 860. The Tenth Circuit leaves open the possibility that other "special circumstances" may exist which would support another formulation of an appropriate cramdown interest rate. *See id.* at 860 n. 10.

a "current market rate" is the date of the new loan, or the effective date of the plan. Therefore the "current market rate" may be different than the rate prevailing at the time of the original loan. The Tenth Circuit's pronouncement was intended to insure that neither the creditor nor the debtor are prejudiced or benefited in a cramdown at the expense of the other. *Id.* at 860.

Debtors and WFS take divergent positions as to the definition of "market" for the purpose of determining a "current market rate" of interest and also disagree on the meaning of the term "similar loan." [4] Debtors take the expansive approach, claiming that the "market" is the entire new and used automobile lending market in the Tulsa area and that "similar loans" are all automobile loans as opposed to "high risk" automobile loans. Debtors contend that neither the creditworthiness of the Debtors nor the actual rates charged by WFS is relevant in determining the "market" rate of interest; Debtors claim that the "market" is neither debtor nor creditor specific, but generic. WFS, on the other hand, contends that "market" is creditor specific and that "similar loan" is debtor specific, *i.e.*, that in this case, the relevant interest rate is the current rate charged by WFS for loans similar to the loan made to Debtor husband. WFS's market niche is "high risk" lending and its interest rate reflects lending practices and expectations in the "high risk" market in general, and its own specifically.

Other circuit courts of appeals have addressed and analyzed the cramdown interest rate issue since *Hardzog*.[5] In 1993, the Third Circuit Court of Appeals elaborated upon the *Hardzog* rule, which it labeled the "coerced loan" approach, in *GMAC v. Jones,* 999 F.2d 63 (3d Cir.1993). The cardinal rule expressed by the *Jones* court is that the creditor should be put in the position it would have been in if it had been permitted to realize the value of its collateral immediately. *Id.* at 66. Since the creditor is not given the option or opportunity to liquidate the collateral in a chapter 13 cramdown, the interest rate assigned should reflect what the particular creditor could have generated with the proceeds if it had been allowed to repossess and liquidate the collateral. *Id.* at 67. *See also id.* at 68 ("we believe the theory behind § 1325(a)(5)(B)(ii) indicates that the appropriate rate is that charged by the particular creditor forced to extend credit.")

*Jones* also defines "similar loan" as—

a loan that the creditor regularly extends to other debtors who are not in bankruptcy but who are otherwise similarly situated to the debtor who is the recipient of the loan coerced by the chapter 13 proceeding and

---

**4.** Neither party took a definite position regarding the relevant region. Debtors introduced documentary evidence as to interest rates advertised by automobile dealers in the Tulsa area and testimony regarding rates charged in the Claremore area. WFS never clearly defined the scope of the areas covered by the interest rate statistics contained in its Exhibit 7. The Court finds that neither party's interest rate evidence fell outside the reasonable scope of a relevant region.

**5.** This Court recognizes the various theories utilized by the various circuit courts and bankruptcy courts in arriving at a formula for determining the cramdown interest rate, but finds it unnecessary to analyze each theory, since the *Hardzog* rule governs in this circuit. *See, e.g., Green Tree Financial Servicing Corp. v. Smithwick (In re Smithwick),* 121 F.3d 211 (5th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998) ("coerced loan" approach with the contract rate as presumptive rate of interest); *GMAC v. Valenti (In re Valenti),* 105 F.3d 55 (2d Cir.1997) (proper interest rate is treasury bill rate plus a risk premium); *In re Koopmans v. Farm Credit Services,* 102

F.3d 874 (7th Cir.1996) ("market" rate of interest); *GMAC v. Jones,* 999 F.2d 63 (3d Cir.1993) (presumptive cramdown interest rate is the contract rate; either party may rebut presumption); *United Carolina Bank v. Hall,* 993 F.2d 1126, 1131 (4th Cir.1993) ("the business opportunity that the secured creditor might otherwise have been able to pursue best determines the present value of the allowed secured claim"); *United States v. Arnold,* 878 F.2d 925 (6th Cir.1989) ("new loan" theory required payment of value of collateral at the creditor's current interest rate); *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982) (current market rate of interest for similar loans in the region); *In re Smith,* 192 B.R. 563 (Bankr.W.D.Okla. 1996) (adopts analysis and procedure of Third Circuit in *GMAC v. Jones* as consistent with *Hardzog* ); *In re Mellema,* 124 B.R. 103 (Bankr. D.Colo.1991) (follows *Hardzog* ).

The Court has examined the assumptions and logic expressed in opinions following or expanding *Hardzog* in forming a conceptual framework for resolving cramdown interest rate disputes in this district.

who are seeking the same kind of credit (*e.g.*, auto loan, home equity loan, etc.). *Id.* at 67 n. 4.

The *Jones* court therefore adopts a debtor-specific approach in determining "similar loan" and a creditor-specific approach in determining "current market rate" in connection with the "coerced loan" theory. Based upon these principles, the Third Circuit adopted a procedure for determining a cramdown interest rate in chapter 13 cases which begins with the presumption that the contract rate of interest is the appropriate cramdown interest rate. The debtor may rebut the presumption by coming forward with evidence that the creditor's current interest rate is less than the contract rate; the creditor may rebut the presumption by coming forward with evidence that its current rate is in excess of the contract rate. *See Jones,* 999 F.2d at 70–71.

Bankruptcy Judge Paul Lindsey adopted the *Jones* analysis and its procedures for chapter 13 cases in the Western District of Oklahoma in *In re Smith,* 192 B.R. 563 (Bankr.W.D.Okla.1996), finding it to be consistent with the principles articulated in *Hardzog. See Smith,* 192 B.R. at 568. The *Jones* procedure is attractive in that it is predictable, and therefore economical due to a likelihood that litigation may be avoided, a goal which is always desirable, even more so in chapter 13 cases where the cost can often exceed the benefit either party might realize as a result of litigation. This Court does not believe that the *Jones* analysis is completely consistent with the dictates of the Tenth Circuit in *Hardzog,* however. In *Hardzog,* the Tenth Circuit held that a "special circumstance" is created when a creditor's current interest rate is higher than the contract rate. Such "special circumstance" renders the higher "current market rate" unfair to the debtor and provides a windfall to the creditor. The Tenth Circuit, therefore, capped the cramdown interest rate at the contract

rate. *See Hardzog,* 901 F.2d at 860. For this reason and others stated herein, this Court declines to follow the Western District of Oklahoma in adopting the *Jones* approach in determining a cramdown interest rate, notwithstanding its practical benefits.

Although the *Jones* analysis takes into consideration that the creditor maintains all the advantages that the creditor originally bargained for, it ignores the additional advantages that the creditor gains when extending credit through a chapter 13 plan such as (1) the decrease in the risk of default due to the debtor's reduction of or restructure of unsecured debt, enforcement of payment by wage deduction, and regularly scheduled payments by the trustee; (2) reduction in the creditor's servicing costs, *i.e.,* no "new loan" expenses or servicing fees, and particularly in this case, no percentage to the referring dealer; and (3) the creditor-friendly effect of the decision of the United States Supreme Court in *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), which dictates that in chapter 13 cramdown cases the value of collateral must be assessed from the perspective of what it would cost the debtor to replace the collateral for the same proposed use rather than what the creditor would realize if it liquidated the collateral.[6] *Id.* at ——, 117 S.Ct. at 1886.

The *Jones* theory—that a creditor who is forced to make a loan to a chapter 13 debtor should realize the same benefit from such coerced loan as it would realize if permitted to reloan the proceeds from repossessed and liquidated collateral to another borrower at its prevailing rate—has at its core the assumption that the creditor would reinvest the *proceeds of liquidated collateral. Rash,* however, requires that the present value of the sum representing the replacement value of the collateral, rather than the liquidation value, be paid out over the life of the chapter 13 plan. *Id.* Since *Rash,* the *Jones* rationale

---

**6.** The court in *Jones* contends that the benefit to the creditor resulting from the decrease in servicing costs is offset by forcing the creditor into a loan without an equity cushion. *See Jones,* 999 F.2d at 68. In reality, however, if allowed to foreclose and liquidate the collateral instead of making the "coerced loan," the creditor would

likely realize less than even the face value of the collateral, because of the difference in the "replacement" value that must be assigned to the collateral in the plan, according to *Rash,* and the lower "forced sale" value. The "coerced loan" is often the most beneficial option for the creditor in any event.

rests upon a faulty premise and is unfairly advantageous to the creditor.

Acknowledging that the *Jones* and *Smith* rationales and procedures are practical, but inconsistent with *Rash* and *Hardzog*, this Court turns to the task of reconciling *Rash* and *Hardzog* to arrive at a cramdown interest rate. *Rash* requires that the debtor pay the creditor the amount the debtor would have to pay to purchase the collateral in the open market if it had surrendered the collateral to the creditor—in other words, the cost to the debtor to replace the collateral. *Hardzog* requires the debtor to pay the creditor an interest rate consistent with the rate the debtor could obtain if the debtor sought a new, similar loan from a lender in the region. These two concepts in tandem create a logical perspective from which to view a chapter 13 cramdown: What would be the cost to this debtor to replace this collateral *and this lender?*

Section 506(a) of the Bankruptcy Code provides the rationale for the *Rash* method of valuing collateral for a chapter 13 cramdown; Section 506(a) requires that a court establish the value of collateral in light of the "proposed *disposition* or use of such property." 11 U.S.C. § 506(a) (emphasis added). In the case of a chapter 13 cramdown, the disposition is retention by the debtor; therefore, the value of the collateral is established at what the collateral is worth *to the debtor.* *See Rash,* —— U.S. at ——–——, 117 S.Ct. at 1884–85.

The rationale with respect to establishing an *interest rate* at "replacement value" is not derived from Section 506(a) but from the statutory scheme incorporated into Section 1325(a)(5). Section 1325(a)(5) provides the debtor with several options in treating secured debt[7] and the underlying collateral. Although not mentioned in Section 1325 as an option, the debtor may, of course, choose to retain the collateral and continue to pay the creditor according to the original terms of the loan, which, if the debtor is not in default, must be accepted by the creditor as

a matter of contract. Or the debtor may retain the collateral and make installment payments to the creditor equal to the value of the collateral, compensating the creditor for the extension of credit by paying interest, thereby forcing the existing creditor to make a new loan to the debtor in the amount of the value of the collateral (the "cramdown"). *See* 11 U.S.C. § 1325(a)(5)(B). Or the debtor may negotiate new terms agreeable to the existing creditor, which when incorporated into the chapter 13 plan, are accepted by the existing creditor. *See* 11 U.S.C. § 1325(a)(5)(A). If the debtor is not satisfied with the interest rate demanded by the creditor in order to accept the plan, the debtor may surrender the collateral to the creditor and discharge its obligation to the creditor. *See* 11 U.S.C. § 1325(a)(5)(C).

Hypothetically, if the debtor desires to retain the collateral but does not believe the existing lender's current interest rate is fair, the debtor has another option not contained in Section 1325. The debtor simply can look elsewhere for a more favorable rate. For instance, the debtor may surrender the collateral to the creditor and purchase a replacement for the collateral (at replacement value, consistent with the *Rash* rationale) *and* obtain replacement financing for such replacement collateral after negotiating lending terms, including an interest rate, with other lenders in the open market. Or the debtor could retain the collateral and refinance through another lender, taking out the existing lender. The hypothetical refinanced loan is analogous to the hypothetical replacement of the collateral required by *Rash.* The interest rate evolving from the hypothetical refinance is probative of the "current market rate for similar loans."

Taking the hypothetical refinance a step further, if the debtor was not be able to obtain financing in the open market on more favorable terms than those offered by the existing creditor, but the debtor still desired to retain the collateral, the debtor could return to the option provided by Section

---

**7.** Section 1325(a)(5)'s options are supported by the authority granted in Section 1322(b) to "modify the rights of holders of secured claims," including giving the debtor the opportunity to cure defaults and modify the interest rate and term of the loan, in addition to the lien-stripping authority granted in Section 506(a).

1325(a)(5)(B) and enter into a new transaction with the existing creditor at its current rate[8] in order to keep the collateral. The fact that no other lender would offer a lower rate is evidence that the existing lender's rate is similar to the "current market rate for similar loans."

Let it be clear that this Court is not requiring debtors to pursue alternative financing—the above analysis is intended to provide logical and linear support for the approach that this Court is adopting for determining a chapter 13 cramdown interest rate. The debtor has numerous options available in connection with the disposition of collateral and secured debt in a chapter 13 proceeding. But *if* the debtor desires to retain collateral *notwithstanding* default on its obligation to the secured creditor and notwithstanding the secured creditor's unwillingness to voluntarily extend credit to the debtor, the secured creditor should not be forced to extend credit on terms less advantageous than it would currently demand from other similarly situated borrowers.[9]

The Court is not unmindful of the advantages to the creditor in lending to a chapter 13 debtor who has stripped or reduced unsecured debt and reorganized remaining financial obligations by virtue of a feasible plan confirmed by the Court. Decreased risk and reduction or elimination of servicing costs and new loan expenses, among other things, are factors that must be considered in setting the cramdown interest rate.[10] Therefore, in recognition of a debtor's newly improved financial status, the existing creditor's current rate must be adjusted for benefits to the creditor in making the new loan to a chapter 13 debtor, including but not limited to reduction of risk, reduction in servicing costs,[11] and elimination of overrides payable to dealers, if applicable. The detriment to the creditor due to such a reduction in the interest rate is offset not only by the avoided costs and risk, but also by the benefit to the creditor in receiving the replacement value of the collateral over time rather than the liquidation value it would have received if the property was repossessed or surrendered.

This "replacement lender" theory is consistent with the policy articulated in *Hardzog* that the interest rate should be fair to both the debtor and the creditor, and neither should obtain an advantage over the other, and is also complementary to *Rash* in that the "new" transaction is viewed from the debtor's perspective for both valuation and interest rate determinations. This theory continues the hypothetical transaction commenced in *Rash* that envisions the replacement of the collateral by the debtor. This analysis indicates how the debtor must pay for the collateral that is replaced.

▆▆▆ The Court therefore concludes that the proper starting point for a cramdown interest rate is "the current market

---

**8.** Consistent with *Hardzog*, however, if the contract rate is lower than current market rates, the debtor should get the benefit of the original bargain it made with the creditor. *Hardzog*, 901 F.2d at 860.

**9.** If the debtor shows that it can obtain more favorable financing from some other source, then it *should* obtain the financing from the other source and pay the existing creditor its allowed claim rather than force the existing creditor to *adopt another lender's lending policies and rates.* The Court acknowledges that it would be extremely rare that a lender will voluntarily grant a favorable rate to a chapter 13 debtor. However, some debtors may be in a position to obtain private low interest financing, through family or friends, for example. Obviously, rather than imposing such an obligation on the existing creditor to match a low "family rate," the debtor should accept the family rate and pay the existing secured creditor its allowed secured claim with the

proceeds, if the debtor does not wish to pay the existing creditor's current rate.

**10.** Again, this is consistent with Justice Ginsburg's acknowledgment of the differences between a real replacement of collateral and the hypothetical replacement in *Rash*. In footnote 6 of the opinion, the Court noted that "replacement value, in this context, should not include certain items ... [*i.e.*] the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. Nor should the creditor gain from modifications to the property ... to which a creditor's lien would not extend under state law." *Rash*, —— U.S. at —— n.6, 117 S.Ct. at 1886 n.6 (citations omitted).

**11.** The debtor pays substantial servicing costs for payment through a chapter 13 plan in the form of trustee's fees.

rate for similar loans made in the region at the time the new loan is made," where "similar loan" means a loan by the particular secured creditor to a borrower with a credit record similar to that of the debtor at the time the original loan[12] was made, and "current market rate" is the rate at which the particular creditor charges for such "similar loans" in the region, as of the effective date of the plan. The creditor objecting to the proposed interest rate has the burden of proving the breadth of its current rates and the criteria under which loans are made at such rates, and must establish why the debtor would fall within such rate criteria.

12. The financial status of the debtor at the time the original loan was made is used, rather than the status at the time of the cramdown, because in applying the procedure promulgated herein, the Court takes the debtor's current financial status into account when it adjusts the interest rate.

13. The Court recognizes that some cases will involve debtors who originally obtained financing at favorable interest rates based upon a more positive financial status and credit history at the time of the original financing, in which case the chapter 13 plan would not improve debtor's financial status as compared to the time of the original financing, and no reduction will be necessary or justified. Some cases will involve debtors who obtained a favorable rate due to special promotions or during an era of historically low interest rates. Again, these debtors will be allowed to retain the favorable rates because *Hardzog* caps the cramdown rate at the contract rate, which in such a case would be a rate lower than the current market rate.

14. It is unfortunate that a more simple standard cannot be fashioned. This Court is cognizant that the standard it has adopted will not necessarily provide guidance with the clarity and simplicity required to avoid litigation of the interest rate issue. However, at this time, this Court is constrained by the language of Section 1325(a)(5) of the Bankruptcy Code as interpreted by the Tenth Circuit and the United States Supreme Court.

In recognition of the destablizing effect the *Rash* decision has had on valuation standards that have been established as traditional (and therefore predictable) in bankruptcy courts throughout the nation, the National Bankruptcy Review Commission ("Commission") has proposed that the Bankruptcy Code be amended to establish a clear standard of valuation that does not change from one factual setting to another. Regarding *Rash*, Judge Frank H. Easterbrook advised the Commission during its July 17, 1997, hearings that "[r]eplacement value cannot be

Downward adjustment of such rate shall be made by the Court, if and when appropriate, in recognition of a debtor's favorable attributes as a reorganized debtor, including the reduction in risk and servicing costs, if applicable.[13] The debtor has the burden of establishing any additional actual avoided costs to the creditor, such as dealer overrides, etc., or proving other "special circumstances" envisioned but not defined by *Hardzog*. Finally, according deference to the Tenth Circuit in *Hardzog*, and in fairness to debtors, this Court will consider the contract rate the *maximum* rate a debtor will be required to pay in a chapter 13 plan.[14]

looked up. It must be litigated; and in the process the value of the asset will be paid out to the lawyers rather than to the creditors." Report of the National Bankruptcy Review Commission (hereinafter "NBRC Report"), Vol. I, at 248 n.271 (October 20, 1997). In response to the complex valuation calculation that *Rash* now mandates for property valuation, which involves adding and subtracting various expenses (each of which may be disputed), the Commission has recommended that "[a] creditor's secured claim in personal property should be determined by the property's wholesale price," a figure that can be "looked up" in industry reports, such as the NADA valuation books. NBRC Report, Vol. I, at 243. .If the Code were amended to establish the wholesale price as the standard, this Court's interest rate analysis would be different and perhaps less complex.

The Commission further recommended that the Code be amended to establish fixed criteria for interest rates in light of the differing formulae adopted by the circuit courts of appeal. *See supra* note 5. "The Commission recommends that the rate of interest should be determined using a nationally recognized rate to promote equal treatment of similarly situated debtors and creditors." NBRC Report, Vol. I, at 261. Although the Commission did not recommend a particular formula, it refers to the treasury bill rate as a starting point, with additional percentage points added to compensate for risk. *Id.*

The NBRC's recommendation is similar to the standard that was promulgated by the Second Circuit Court of Appeals in the case of *GMAC v. Valenti (In re Valenti)*, 105 F.3d 55 (2d Cir.1997). This Court finds the *Valenti* analysis persuasive and its approach attractive, logical and practical; this Court would adopt such approach if not constrained by *Hardzog*. The "treasury bill rate plus risk premium" approach would be easily calculable and thus ascertainable without extensive litigation, would reflect general market conditions, would lead to uniform rates throughout the nation, and would be uniform among creditors, so that one creditor would not be paid a

Applying these standards to this case, the Court finds that the contract rate was 21%; on the date of the hearing, WFS's current market rate for "similar loans"—that is, the current rate WFS charges a borrower whose financial condition is similar to that of the Debtor husband when he originally obtained the loan—was 20.09%; and that after deducting the average dealer overrides, WFS was entitled to 19.2% interest on the principal debt. In recognition of the improvement of the Debtors' financial condition by virtue of the terms of their chapter 13 plan and the security afforded by a wage assignment and trustee disbursement, the Court further reduces the rate by 2.0% to account for the reduction in risk of default, resulting in a rate of 17.2%. Because the parties had no notice of other factors that the Court would consider in arriving at an interest rate, the Court will allow the parties the opportunity to present additional evidence if the parties believe that other evidence exists that is relevant to the determination as now framed that would alter the Court's determination.

Debtors are granted until March 25, 1998, to submit an amended plan consistent with the findings and conclusions contained in this Memorandum Opinion and consistent with the Debtors' representation at the hearing that the correct mortgage arrearage owed Ocwen Federal Bank would be reflected in the amended plan. Either party may submit a request for hearing to present additional evidence concerning reduction factors on or before March 13, 1998.

higher interest rate than another within the same plan. The Code does not allow courts to disregard precedent in order to achieve practicality, however. Until Congress or the Supreme Court confront the divergent approaches to interest rate selection generated by the circuits and promulgate a uniform rule, the dictates of *Hardzog* and *Rash* control this Court's options in adopting an approach to determine chapter 13 cramdown interest rates.