**In re Efrain FELIPE and Maria Felipe, Debtors.**

**Bankruptcy No. 98–24571–BKC–PGH.**

United States Bankruptcy Court,
S.D. Florida,
Fort Lauderdale Division.

Nov. 10, 1998.

Michael J. Brooks, North Miami, FL, for Debtors.

Patricia Ecker Gleason, Patricia E. Gleason, P.A., Hollywood, FL.

Michael Frank, North Miami, FL.

Robin R. Weiner, Fort Lauderdale, FL, Standing Chapter 13 Trustee.

## *MEMORANDUM DECISION AND ORDER DENYING CONFIRMATION OF DEBTORS' FIRST AMENDED CHAPTER 13 PLAN*

PAUL G. HYMAN, Jr., Bankruptcy Judge.

**THIS MATTER** came before the Court on October 13, 1998, upon Mr. C's Auto Sales of Hollywood, L.C.'s ("Mr. C's") Objection to Confirmation of Efrain and Maria Felipe's

(the "Debtors") First Amended Chapter 13 Plan (the "Objection to Confirmation"). At the Confirmation Hearing on October 13, 1998, the Court instructed Mr. C's and Debtors to submit to the Court Memoranda of Law in Support of their respective positions on the Objection to Confirmation. After reviewing the Objection to Confirmation, Mr. C's Memorandum of Law and Affidavit of Dana Ross–Cohen in support thereof, and the Debtors' Memorandum of Law in Opposition to the Objection to Confirmation, the Court, being fully advised in the premises, hereby enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Mr. C's is a Florida limited liability corporation which sells used vehicles to "high risk" borrowers, typically, persons with poor credit history and/or borrowers who cannot obtain loans at conventional market rates. In order to determine the appropriate interest rate for a vehicle sale, Mr. C's evaluates the collateral, the loan-to-value ratio, the borrower's credit report, the borrower's payment history and the borrower's income.

On January 31, 1998, the Debtors executed a contract (the "Contract") for the purchase of a 1992 Ford Ranger Truck, VIN 1FTCR10A6NUC69671 (the "Truck"), from Mr. C's. The Debtors' credit report contained information that they were repeatedly late in paying their mortgage to Chase Manhattan Mortgage Corporation, repeatedly late in paying their Providian credit card, which was ultimately charged off, and were repeatedly late in making payments to Affiliated Financial.

Pursuant to the Contract, the Debtors were to pay the principal sum of $7,581.93 for the Truck. The terms of payment were $1,225.00 down and the balance of $6,382.13 was financed at 30.758% A.P.R. Forty-one payments in the amount of $195.00 were to be made every other week, with one final payment of $124.43, for a total sales price of $9,344.43. The sales price included the cost of the license plate and sales tax paid.

On June 30, 1998, Debtors filed a petition under Chapter 13 of the Bankruptcy Code. At the time of the filing, the Debtors were delinquent in their payments to Chase Manhattan Mortgage Corporation ("Chase") which has a first mortgage on the Debtors' homestead property, Mercury Finance which holds a security interest in the Debtors' 1994 Toyota Corolla, and Mr. C's which holds a security interest in the Truck. The Debtors in their First Amended Chapter 13 Plan propose to pay Mr. C's the principal sum of $5,000.00, at a rate of 8.00%, over a term of 58 months. In the Objection to Confirmation, Mr. C's claims that the proper interest rate should be based on Mr. C's current market rate of interest for similar loans in South Florida, which would be 29.6684%, payable $125.00 bi-weekly (or $250.00 per month) for a term of twenty-seven months.

Mr. C's and the Debtors stipulate and agree that the current value of the Truck is $5,000.00. The Parties also stipulate and agree that the average market interest rates charged by conventional lenders in South Florida for automobile loans range from 8.00% to 12.00% depending on the credit worthiness of the borrower. However, these same lenders do not lend money for the purchase of used vehicles more than five (5) years old. The Truck is more than five (5) years old, and therefore, the Debtors would not be able to qualify for conventional financing.

The sole issue before this Court is the determination of the appropriate interest rate for Mr. C's secured claim pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii).

## CONCLUSIONS OF LAW

■ This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). As this is a case involving the Confirmation of a Chapter 13 plan and the valuation of a secured claim, the Court must look to 11 U.S.C. § 1325(a)(5)(B)(ii) for guidance. Section 1325(a)(5)(B)(ii) provides in pertinent part:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(5) with respect to each allowed secured claim provided for by the plan—

(B)(ii) the value as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]

Under Chapter 13, the secured creditor is not permitted to repossess and foreclose on its security interest. *See In re Valenti*, 105 F.3d 55, 58 (2d Cir.1997). The debtor instead has the option of either surrendering the property to the secured creditor or maintaining possession of the property. *See id.* If the debtor decides to maintain possession, the secured creditor retains its security interest and the debtor's reorganization plan must provide for payments to this secured creditor totaling no less than the present value of the secured creditor's allowed claim. *See id.* To insure payment of the present value as of the plan's effective date, Chapter 13 plan payments must incorporate an appropriate discount interest rate. *See id.* When, as in the instant case, the debtor attempts to have the Chapter 13 plan confirmed that provides for an interest rate that is lower than the interest rate in the original financing agreement, over the objection of the secured creditor, the plan is colloquially referred to as a "cramdown." *See id.*

There are no reported cases in the Eleventh Circuit or the Southern District of Florida that set the standard for determining the "current market rates" of interest for secured claims pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) in Chapter 13 cramdown situations. This Court therefore looks to the Eleventh Circuit's interpretation of similar provisions of the Bankruptcy Code. The present value language of 11 U.S.C. § 1325(a)(5)(B)(ii) is virtually identical to the present value language set forth in 11 U.S.C. § 1129(a)(9)(C).[1] In *United States v. South-*

*ern States Motor Inns, Inc. (In the Matter of Southern States Motor Inns, Inc.),* 709 F.2d 647, 652–653 (11th Cir.1983), *cert. denied* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), the Eleventh Circuit construed this latter provision in the context of a Chapter 11 reorganization case concerning the appropriate interest rate for deferred payments of delinquent federal taxes:

> We believe Congress intended that creditors required to accept deferred payments pursuant to § 1129(a)(9)(C) should be placed in as good a position as they would have been had the present value of their claims been paid immediately. Consequently, we hold that the interest rate to be used in computing the present value of a claim pursuant to § 1129(a)(9)(C) should be the current market rate without any reduction for the 'rehabilitation aspects' of the plan.

*Southern States,* 709 F.2d at 652–53. The Eleventh Circuit, citing 5 COLLIER ON BANKRUPTCY ¶ 1129.03, at 1129–65 (15th ed.1982), listed certain factors which should be considered when determining the market rate of interest:

> The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*Id.* at 651. The court, in *dicta*, then endorsed the "coerced loan" approach as the method to determine the "current market

---

1. 11 U.S.C. § 1325(a)(5)(B)(ii) states in relevant part:
   (a) Except as provided in subsection (b), the court shall confirm a plan if—
   (5) with respect to each allowed secured claim provided for by the plan—
   (B)(ii) the value as of the effective date of the plan, of property to be Distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]
   11 U.S.C. § 1129(a)(9)(C) is as follows:
   (a) The court shall confirm a plan only if all of the following requirements are met:

   (9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
   (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

rate" of interest: "deferred payment of a claim under § 1129 is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral and risk." *Id.* at 652 n. 7 (citing 15 COLLIER ON BANKRUPTCY ¶ 1129.03, at 1129–62, 63). The Court went on to state that when determining the "current market rate" of interest, "the debtor's ability to pay ... is irrelevant when the question is whether the plan provides for payment of the present value of a creditor's claim as required by § 1129(a)(9)(C)." *Id.* at 653 n. 9. Furthermore, the Court noted that

> in *In re Benford*, [14 B.R. 157, 161 (Bankr. W.D.Ky.1981) ], a Chapter 13 case construing language identical to that found in § 1129(a)(9)(C) "[t]he statute reads 'value as of the effective date of the plan'; it does not read 'value, as of the effective date of the plan, but subject to reduction depending on the debtor's ability to pay.' "

*Id.* at 652. The Eleventh Circuit in *Southern States* therefore held that the "current market rate" of interest shall be determined by the "coerced loan" approach, whereby a court must look to interest rates charged by the creditor making a loan to a third party with similar terms, duration, collateral, and risk.

The "coerced loan" approach to determining the "current market rate" of interest represents the dominant view among the Circuits. *See Green Tree Financial Servicing Corporation v. Smithwick (Matter of Smithwick)*, 121 F.3d 211 (5th Cir.1997), *cert. denied* — U.S. ——, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998); *GMAC v. Jones*, 999 F.2d 63 (3rd Cir.1993); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1131 (4th Cir. 1993); *Hardzog v. Federal Land Bank (In re Hardzog)*, 901 F.2d 858 (10th Cir.1990); *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982). In *Hardzog*, the Tenth Circuit adopted the "coerced loan" approach for determining the "current market rate" of interest in Chapter 12 cases, holding that "Bankruptcy Courts should use the current market rate of interest used for similar loans in the region." 901 F.2d at 860. The court explained that 11 U.S.C.

§ 1225(a)(5)(B)(ii) is predicated on the theory that the lender is making a new loan to the debtor. "It therefore follows that the most appropriate interest rate is the current market rate for similar loans made in the region at the time the new loan is made." *Id.* In two recent bankruptcy cases in the Tenth Circuit, *In re Oglesby*, 221 B.R. 515 (Bankr. D.Colo.1998) and *In re Segura*, 218 B.R. 166 (Bankr.N.D.Okl.1998), the courts extensively discuss and apply the "coerced loan" approach of *Hardzog*.

The facts in *Oglesby* are almost identical to the facts in the instant case. In *Oglesby*, the court consolidated two Chapter 13 cases wherein the debtors sought to "cramdown" the contract interest rates charged by secured creditors on automobile loans. The contract rates were 20.19% and 21.00% respectively. The debtors proposed to reduce the interest rate to 9.00% in their plans. The secured creditors filed objections to confirmation of the plans. The secured creditors in *Oglesby*, like Mr. C's in the instant case, routinely extended credit to high risk borrowers, or persons with poor credit histories, who could not qualify for conventional financing. The *Oglesby* Court adopted the "coerced loan" approach and held that

> [t]he Tenth Circuit requires that the current market rate reflect the rates used in similar loans in the region. This Court will equate "similar" loan with a loan that the creditor regularly extends to other borrowers who are not in bankruptcy but who are otherwise similarly situated to the debtor. This Court believes that this will be best exemplified by the actual, average rate charged by a particular creditor on loans it has recently and routinely extended to similarly situated borrowers in comparable transactions in this region.

*Id.* at 524. The court ultimately found that the contract rates were equal to the average interest rates charged by these secured creditors over the past three to four months and used the contract rates of 20.19% and 21.00% respectively as the appropriate capitalization rates in the plans. *See id.*

Similarly, the court in *Segura* adopted the "coerced loan" approach in a similar chapter 13 cramdown case. *See Segura*, 218 B.R. at

175–76. In *Segura,* the lender, like Mr. C's in the instant case, made it a practice to finance used automobile purchases for "high risk" borrowers. *See id.* at 169. The lender objected to the debtor/borrower's chapter 13 plan because it provided for a discount rate that the lender did not believe would provide it with the present value of its allowed secured claim. The issue before the court in *Segura,* then, was what discount rate would insure that the lender receive the present value of its allowed secured claim. The court, after discussing at length other cases including *Hardzog* that addressed the chapter 13 cramdown interest rate issue, concluded that

> the proper starting point for a cramdown interest rate is the "current market rate for similar loans made in the region at the time the new loan is made" where "similar loan" means a loan by the particular secured creditor to a borrower with a credit record similar to that of the debtor at the time the original loan was made, and "current market rate" is the rate at which the particular creditor charges for such "similar loans" in the region, as of the effective date of the plan.

*Id.* at 175–76. Furthermore, the Third Circuit in *Jones,* 999 F.2d 63, one of the cases discussed in *Segura,* also adopted the "coerced loan" approach and held that

> because the effect of the instant cramdowns was to force GMAC to extend loans to appellees for the duration of the plans, we hold that the appropriate interest rate under § 1325(a)(5)(B)(ii) is the interest rate that GMAC would charge at the time of the effective date of the plans, for a loan of similar character, amount and duration.

*Id.* at 70. In an effort to eliminate further litigation over the issue of "current market rates" of interest, the Third Circuit in *Jones* proposed a rebuttable presumption approach to chapter 13 cramdown cases:

> We conclude that it would be consistent with the statutory objective and would reduce litigation expenses if we imposed an additional rule of practice in this area. The contract rate of interest is, of course, the rate that the creditor voluntarily agreed to accept at an earlier date. While in some cases the passage of time will have seen a material increase or decrease in the lending rate of the creditor, the contract rate is the fair place to begin. In the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its current interest rate is in excess of the contract rate. Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate.

*Id.* at 71–72; *See also Smithwick,* 121 F.3d 211 (adopting the rebuttable presumption approach of the Third Circuit).

The Fourth Circuit and the Sixth Circuit have also adopted the "coerced loan" approach in Chapter 13 cramdown situations. In *Hall,* 993 F.2d at 1131, the Fourth Circuit held that

> we adopt a rule that looks to the secured creditor's lending market in determining what rate of interest best provides the secured creditor with its present value, taking into account not only the rates which it obtains from similar loans in the area but also its expenses in obtaining these loans, either by its own underwriting or in its purchases from dealers.

Moreover, the Sixth Circuit in *Whitman,* 692 F.2d at 431 decided that

> [r]ather than tying the interest rate to an arbitrary ten percent rate, the Bankruptcy Court's solution, or some other arbitrary rate, we hold that in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region.

A competing approach to determining the "current market rate" of interest for allowed secured claims, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), in Chapter 13 cramdown

cases is the "cost of funds" approach. Under this approach, the market rate of interest is based on the interest rate that lenders are charged to obtain their funds. The Second Circuit, in *Valenti*, 105 F.3d at 63, explained that

> [c]ourts using this approach reason that the best way to place a creditor in the same economic position that it would have been in had the debtor surrendered the collateral immediately is to assume that the creditor would borrow the money representing the value of the allowed claim. Then, the creditor could make new loans to consumers at prevailing rates in the commercial market.

The *Valenti* Court went on to criticize the "coerced loan" approach suggesting that courts that adopt that approach

> misapprehend the "present value" function of the interest rate. The objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately. The purpose is *not* to put the creditor in the same position that it would have been in had it arranged a "new" loan. . . . [T]he value of a creditor's allowed Claim does not include any degree of profit. There is no reason, therefore, that the interest rate should account for profit.

*Id.* at 63–64 (emphasis in original). Despite its disapproval of the "coerced loan" approach, the Second Circuit in *Valenti* declined to adopt the competing "cost of funds" approach, finding that "courts using a 'cost of funds' approach are likely to treat debtors inequitably. Chapter 13 debtors would be charged different interest rates depending upon how much their respective creditors have to pay for funds." *Id.* at 64. Instead, the *Valenti* Court held that

> the market rate of interest under § 1325(a)(5)(B)(ii) should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan. This method of calculating interest is preferable to either the 'cost of funds' approach or the 'forced loan' approach because it is easy to apply, it is

objective, and it will lead to uniform results. In addition, the treasury rate is responsive to market conditions.

*Id.* The court recognized that the interest rate should include a premium to reflect a creditor's risk in receiving deferred payments of the present value of the collateral under the reorganization plan. The actual risk premium, according to the court, however, may vary from one to three percent depending upon the "circumstances of the debtor, including prior credit history as well as the viability of the reorganization plan." *Id.* Finally, the *Valenti* court suggested that bankruptcy courts should conduct hearings limited solely to a determination of the risk premium. In the instant case, in the Memorandum in Opposition to Mr. C's Objection to Confirmation, the Debtors argue that this Court should adopt the *Valenti* Court's approach because it is objective and will lead to "uniform results." The Debtors go on to suggest that if the Court adopts the "coerced loan" approach, the Court will have to conduct an evidentiary hearing to determine the interest rate that Mr. C's would charge a similarly situated borrower attempting to obtain a similar loan in the same region. This Court, though, would have to conduct an evidentiary hearing regardless of which approach it adopts because the *Valenti* Court's approach calls for a determination of the appropriate risk premium. This Court does not find it problematic or over-burdensome to conduct an evidentiary hearing when there are factual issues to resolve.

 In local Chapter 13 cramdown cases, debtors have typically proposed plans providing for interest rates between 8.00% and 12.00% because that range of interest rates is what conventional lenders of automobile loans currently charge on loans for vehicles *less than five years old.* In the instant case, however, Mr. C's loaned funds to the Debtors for a vehicle *more than five years old,* so the 8.00% to 12.00% range of interest rate is not applicable. Following the "coerced loan" approach, this Court holds that on the effective date of the plan, Mr. C's is entitled to a "current market rate" of interest calculated by determining what Mr. C's would charge third parties, with credit records similar to

those of the Debtors, but for filing bankruptcy, over the same term, for the purchase of the same vehicle, in the same region. The Debtors' ability to pay is irrelevant. Although in an affidavit provided to this Court, Dana Ross–Cohen, Vice President of Mr. C's, indicated that the current interest rate for borrowers in the same position as the Debtors, but for filing bankruptcy, would be 29.6684% payable $125.00 bi-weekly (or $250.00 per month) for a term of twenty-seven months, the Court finds that an evidentiary hearing is necessary to determine the "current market rate" of interest that the Debtors must pay to ensure that Mr. C's receives the present value of the allowed secured claim, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii).

This Court does not adopt the "rebuttable presumption" approach for determining "current market rates" of interest for "coerced loans" pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii) as set forth by the Third Circuit in *Jones*. Rather, the Court finds it prudent to determine, through an evidentiary hearing, the "current market rate" of interest in a Chapter 13 cramdown situation on a case-by-case basis. The Tenth Circuit agreed, explaining that "the market rate should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for similar loans in the region." *Hardzog*, 901 F.2d at 860 ("[C]ourts are well equipped to determine market rates[.]"). *See also Memphis Bank*, 692 F.2d at 431 ("Bankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans. And where parties dispute the question, proof can easily be adduced.") Furthermore, the Court does not adopt the Second Circuit's approach in *Valenti* of fixing the interest rate on a United States Treasury instrument and conducting a hearing to determine the risk premium. Instead, this Court will follow the Eleventh Circuit's lead. Because the Eleventh Circuit in *Southern States* clearly endorses a "coerced loan" approach for Chapter 11 cases that is identical to the approach for Chapter 13 cases adopted by the Tenth Circuit in *Hardzog* and the bankruptcy courts in *Ogles-*

*by* and *Segura*, as well as a number of other Circuits, this Court adopts the "coerced loan" approach for determining the "current market rates" of interest for allowed secured claims in Chapter 13 cramdown cases. Therefore, an evidentiary hearing must be held to determine what Mr. C's would charge third parties, with credit records similar to those of the Debtors, but for filing bankruptcy, over the same term, for the purchase of the same vehicle, in the same region.

## CONCLUSION

Based on the foregoing discussion and analysis, the Court concludes that the Eleventh Circuit's "coerced loan" approach is the proper method of determining the "current market rate" of interest, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), in Chapter 13 cramdown cases. In order to determine the "current market rate" of interest in the instant case, the Court will hold an evidentiary hearing to ascertain what Mr. C's would charge third parties, with credit records similar to those of the Debtors, but for filing bankruptcy, over the same term, for the purchase of the same vehicle, in the same region. Accordingly, confirmation of the Debtors' First Amended Chapter 13 Plan is deferred pending the outcome of this evidentiary hearing.

## *ORDER*

In accordance with the foregoing, and with the Court being fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that:

1. The Court adopts the "coerced loan" approach of determining the "current market rate" of interest in Chapter 13 cramdown cases, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), such that the "current market rate" of interest is that which the instant lender would charge a similarly situated third party, with credit records similar to those of the instant debtor/borrower, but for filing bankruptcy, over the same term, for the purchase of the same goods, in the same region.

2. The Court will hold an evidentiary hearing to determine the "current market

rate" of interest that Mr. C's would charge similarly situated third parties, with credit records similar to those of the Debtors, but for filing bankruptcy, over the same term, for the purchase of the same vehicle, in the same region.

3. Confirmation of the Debtors' First Amended Chapter 13 Plan is deferred pending the outcome of this evidentiary hearing.