In re Lyman E. **HASKELL**, Debtor.

No. 99–04823–3F3.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Aug. 15, 2000.

Edward P. Jackson, Jacksonville, FL, for Debtor.

Nina M. LaFleur, Jacksonville, FL, for Unsecured Creditors.

Edward C. Tannen, Jacksonville, FL, for Tax Collector.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case came before the Court for confirmation of Debtor's Third Amended Chapter 13 Plan and objections to confir-

mation filed by Lynwood Roberts, Tax Collector for the City of Jacksonville, Florida (Doc. 62) and unsecured creditors, Ortho F. Holtzclaw, Jennifer L. Lane and Laurence H. Lane, and John L. Holland ("Unsecured Creditors") (Doc. 78). Upon evidence presented at the June 29, 2000 hearing, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Lyman E. Haskell ("Debtor") is in the business of marine vehicle sale and repair and has attempted to keep this business afloat by filing repeated Chapter 13 cases. Debtor operates Haskell's Marine as a sole proprietor. Debtor filed his first voluntary chapter 13 petition on May 20, 1997, Case No.: 97–3911–3F3. The Court entered an Order Dismissing Case for Failure to File Joint Certification on November 18, 1997. Debtor filed his second voluntary chapter 13 petition on December 5, 1997, Case No. 97–9316–3P3. The Court entered an Order Directing Debtor to Continue Payments in that case on September 23, 1998 and an Order Dismissing Case on October 14, 1998.

On June 25, 1999, Debtor filed his third voluntary chapter 13 petition. Debtor listed total assets of $320,540.00 and total liabilities of $625,552.45, of which $354,411.47 is secured.[1] Debtor's Schedule I—Current Income of Individual Debtor lists Debtor's total monthly income at $14,400.00. Debtor's Schedule J—Current Expenditures of Individual Debtor lists total monthly expenses of $10,468.00 and proposes to pay $3,932.00 into his plan. Schedule J shows Debtor's major expense in the amount of $9,258.00 to be for expenses from operation of his business. Although "(attach stmt)" is listed by this category, there is no breakdown of these expenses.

On October 29, 1999 the Court entered an Order Directing Debtor to Continue

---

1. Debtor's Summary of Schedules lists $33,066.02 of unsecured priority claims, however, Debtor's Schedule E only lists $16,533.01 of unsecured priority claims.

Payments. (Doc. 42.) The Trustee's Motion to Dismiss, filed October 27, 1999, noted that Debtor was $9,400.00 in arrears as of October 9, 1999. (Doc. 41.) On February 17, 2000 the Court entered a second Order Directing Debtor to Continue Payments in the current bankruptcy case. (Doc. 72.) The Trustee's Motion to Dismiss, filed February 17, 2000, noted that Debtor was $9,400.00 in arrears as of February 8, 2000. (Doc. 71.) Debtor filed a Motion for Additional Time to Become Current on Interim Chapter 13 Payments on February 25, 2000. (Doc. 77.) On March 1, 2000 the Court entered an Order Denying Debtor's Motion but allowed Debtor until March 7, 2000 to become current.

At a March 7, 2000 confirmation hearing, Debtor's case was dismissed. This dismissal was based on the objection of various unsecured creditors that the case exceeded the 11 U.S.C. § 109(e) jurisdictional debt limits. On March 14, 2000 the Court entered an Order of Dismissal. (Doc. 93.) On April 24, 2000 the Court set aside its Order of Dismissal and gave Debtor thirty (30) days to become fully current.[2]

Debtor's Chapter 13 Plan, filed on July 9, 1999, lists monthly Plan payments of $4,700.00 per month for sixty (60) months. Debtor's Amended Plan lists monthly Plan payments of $4,700.00 for the first eight (8) months and $5,700.00 for the final fifty-two (52) months. Debtor's Third Amended Chapter 13 Plan, filed on June 12, 2000, lists monthly Plan payments of $4,700.00 for the first eight (8) months, $5,700.00 for the next two (2) months, and $6,000.00 for the final fifty (50) months.

**2.** Debtor received a refund of $20,635.51 from the previous dismissal. The arrearage on April 19, 2000 was $35,735.51 with additional payments of $5,700.00 due on May 9, 2000 and the 9th day of each month thereafter.

**3.** The Court went on to say that it is bound by decisions of the Eleventh Circuit Court of Appeals setting forth that bankruptcy courts should use the market rate of interest. *See*

Debtor was $11,700.00 in arrears at the June 29, 2000 confirmation hearing. The Court's June 30, 2000 Order directed Debtor to continue to make his monthly payments in the amount of $6,000.00 per month while the Court considered the pending objections.

### a. Objection of Tax Collector

Lynwood Roberts ("Tax Collector") objects to Debtor's Amended Chapter 13 Plan on the basis that the Plan does not properly provide for payment of interest as provided by law. Tax Collector has a secured claim for real property taxes on Debtor's business property in the amount of $30,257.70. Debtor's plan provides that:

> LYNWOOD ROBERTS, TAX COLLECTOR FOR DUVAL COUNTY, has a tax lien on the Debtor's real estate at 53 Arlington Rd., Jacksonville, Florida in the amount of $30,257.70. The Trustee shall pay this sum in full with 9% interest over the life of the Plan by equal monthly payments of $628.20 per month for sixty (60) months.

Tax Collector is an oversecured creditor asserting entitlement to an eighteen percent (18%) rate of interest from the date of delinquency pursuant to Fla. Stat. § 197.172. Attached to Tax Collector's objection is the transcript from the January 11, 2000 hearing in the bankruptcy case of *In re Perez*, Case No.: 99–2624–3P3. In that case, the Court determined that the eighteen percent (18%) statutory rate of interest was the market rate of interest but qualified its holding by stating the Court is not bound by the statutory interest rate.[3]

*United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.),* 709 F.2d 647 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) (determining appropriate interest rate for deferred payments of delinquent federal taxes under § 1129(a)(9)(C) in the context of a Chapter 11 reorganization case). The Court then states that the Eleventh Circuit does not exactly tell bankruptcy courts how to determine market rate of interest.

Jim Smith, district manager with American General Finance Group, testified that his company is primarily in the business of making consumer loans. Mr. Smith stated that a bankruptcy filing is a risk factor and results in potential lenders charging the maximum rate of interest allowed by the State of Florida. Mr. Smith stated that Debtor, in his current financial condition, would not receive a loan from American General Finance Group at less than an eighteen percent (18%) rate of interest. Debtor introduced the June 29, 2000 Money section of the USA Today newspaper. Debtor also testified that the value of his business property is approximately $127,493.93 and that the mortgage balance on the property is approximately $195,254.64.

### b.  Objection of Unsecured Creditors

Unsecured Creditors assert that Debtor's Plan should not be confirmed because it was filed with a lack of good faith. Unsecured Creditors assert that their prepetition claims are based on causes of action that if liquidated would be nondischargeable in a Chapter 7 case.[4] Unsecured Creditors assert that their omitted claims arise from the false and deceptive sales practices of Debtor while doing business as Haskell's Marine. Mr. Holtzclaw testified as to the specific facts underlying his claim.[5]

---

4.  Debtor failed to list Unsecured Creditors in his bankruptcy schedules. Unsecured Creditors filed motions to allow the filing of their late proofs of claim. Ortho Holtzclaw filed a late claim in the amount of $68,363.93. (Claim No. 27.) Jennifer L. Lane and Laurence H. Lane filed a late claim in the amount of $130,632.92. (Claim No. 28.) John Holland filed a late claim in the amount of $99,760.40. (Claim No. 31.) While these claims were unliquidated on the petition date, they are allowed as general unsecured claims. (Docs. 73, 74, & 110.)

5.  On November 23, 1997, Mr. Holtzclaw purchased a new 1997 Marathon boat, Volvo engine and Fastload trailer from Debtor. Mr. Holtzclaw testified that the manufacturer's

Debtor's Third Amended Chapter 13 Plan provides that unsecured creditors shall receive eight percent (8%) of their allowed claims. Unsecured Creditors claim that the distribution will be less than two percent (2%).

Debtor testified as to the cyclical nature of his business but provided no documentation to support his testimony. Debtor stated that his income fluctuated. During the spring and summer, Debtor claimed his income was higher because that was when people wanted to be out on the water. Debtor also testified that he had been injured and unable to work which in turn caused a decrease in Debtor's income thus explaining the arrearage.

### CONCLUSIONS OF LAW

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(L).

### a.  The Market Rate of Interest should be Eighteen Percent (18%).

The Court looks to 11 U.S.C. § 1325(a)(5)(B)(ii) as this case involves confirmation of a Chapter 13 Plan and valuation of a secured claim. Section 1325(a)(5)(B)(ii) provides in pertinent part:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(5) with respect to each allowed secured claim provided for by the plan—

---

name and serial number had been chiseled out. Mr. Holtzclaw testified that the boat malfunctioned on its very first outing and required towing in by the United States Coast Guard. After subsequent breakdowns and after taking the boat back to Debtor on multiple occasions for repair, Mr. Holtzclaw testified that he finally took the boat to another repairman. At this point Mr. Holtzclaw was lead to believe that the boat was not new at the time of purchase and that the manufacturer had been out of business for several years. Similar to the claim of Mr. Holtzclaw, the claims of Holland and the Lanes arise from the prepetition sale of boats. The bases of these claims are described in Unsecured Creditors' proofs of claim.

(B)(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]

11 U.S.C. § 1325(a)(5)(B)(ii). This provision, often referred to as the Chapter 13 "cram down" provision, is meant to ensure that secured creditors who are required to accept deferred cash payments over time will receive the present value equivalent of their claims. *See United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.)*, 709 F.2d 647 (11th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) (discussing Chapter 11 cram down); *cf.* 11 U.S.C. § 1129(a)(9) (using language virtually identical to § 1325(a)(5)(B)(ii)).[6]

■ In the Eleventh Circuit, creditors who are to receive deferred payments are entitled to interest on their claims at the prevailing market rate. *See Southern States*, 709 F.2d at 652–53. The *Southern States* decision does not subscribe to a particular approach to determine the appropriate market interest rate. *See In re Hollinger*, 245 B.R. 691 (Bankr.N.D.Fla. 2000) (discussing coerced loan and formula methods). However, the Eleventh Circuit, citing 5 COLLIER ON BANKRUPTCY ¶ 1129.03, at 1129–65 (15th ed.1982), listed certain factors which should be considered when determining the market rate of interest:

The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate,

the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*See Southern States*, 709 F.2d at 651. The Court also endorsed the "coerced loan" approach as the method to determine the "current market rate" of interest. *Id.* at 652. *See also In re Felipe*, 229 B.R. 489, 491–92 (Bankr.S.D.Fla.1998) (finding coerced loan method appropriate to determine current market rate).

■ In *Felipe*, the Court noted that the "coerced loan" approach to determining the "current market rate" of interest represents the dominant approach among the Circuits. *See Felipe*, 229 B.R. at 492 (citing *Green Tree Fin. Serv. Corp. v. Smithwick (Matter of Smithwick)*, 121 F.3d 211 (5th Cir.1997), *cert. denied* 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998); *GMAC v. Jones*, 999 F.2d 63 (3d Cir.1993); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1131 (4th Cir.1993); *Hardzog v. Federal Land Bank (In re Hardzog)*, 901 F.2d 858 (10th Cir.1990); *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982)). *See also In re New Midland Plaza Assoc.*, 247 B.R. 877 (Bankr.S.D.Fla.2000) (discussing application of "coerced loan" approach). *See also In re Star Trust*, 237 B.R. 827, 841–42 (Bankr.M.D.Fla.1999) (stating that courts should "attempt to place the secured creditor in as good a position as it would have been had the present value of its claim been paid immediately"). *But see In re Hollinger*, 245 B.R. 691 (Bankr.N.D.Fla. 2000) (applying formula method). This

---

**6.** Secured creditors in chapter 13 cases are not permitted to repossess and foreclose on their security interests. *See In re Felipe*, 229 B.R. 489, 491 (Bankr.S.D.Fla.1998) (citing *In re Valenti*, 105 F.3d 55, 58 (2d Cir.1997)). Instead, debtors have the option of either surrendering the property to secured creditors or maintaining possession of the property. *See Id.* If a debtor maintains possession, the secured creditor retains its security interest and the debtor's plan must provide for payments to this secured creditor totaling no

less than the present value of the secured creditor's allowed claim, which means that payment to unsecured creditors must include an appropriate interest rate. *See Id.* When, as in the instant case, debtors attempt to have a Chapter 13 plan confirmed that provides for an interest rate that is lower than the interest rate in the original financing agreement, over the objection of the secured creditor, the plan is colloquially referred to as a "cramdown." *See Id.*

Court adopts the dominant view and finds that the "current market rate" of interest should be determined by the "coerced loan" approach, whereby a court must look to interest rates charged by the creditor making a loan to a third party with similar terms, duration, collateral, and risk.

■ In the current case, the evidence supports application of an eighteen percent (18%) interest rate. Florida Statute § 197.172, which sets forth the interest rate at which delinquent real estate taxes accrue, provides in pertinent part that:

(1) Real property taxes shall bear interest at the rate of 18 percent per year from the date of delinquency until a certificate is sold, except that the minimum charge for delinquent taxes paid prior to the sale of a tax certificate shall be 3 percent.

(2) The maximum rate of interest on a tax certificate shall be 18 percent per year; . . . .

Fla. Stat. § 197.172 (West 2000). The Tax Collector asserts entitlement to the eighteen percent (18%) statutory rate of interest and claims that this rate is the "current market rate." [7] Debtor presents a valid point that as long as the value of the property exceeds the tax debt then the Tax Collector is secure. However, in all practicality there is no market for hypothetical loans of this sort. [8]

Tax Collector presented evidence that a lender would not make a loan to Debtor in his current financial position for less than the statutory rate of interest. Besides the daily newspaper, Debtor presented no evidence of interest rates available for less than eighteen percent. *See* USA Today, June 29, 2000, at 1B—12B. Accordingly,

when looking to interest rates charged for making a loan to a third party with similar terms, duration, collateral, and risk, the Court finds that in this case an eighteen-percent rate would be the appropriate "current market rate."

### b. Debtor's Plan fails to meet the requirements of 11 U.S.C. § 1325.

■ The confirmation of a Chapter 13 plan relies upon that plan meeting the requirements of 11 U.S.C. § 1325. Specifically, in this Case, the Court focuses upon 11 U.S.C. § 1325(a)(3) requiring that the plan be proposed in good faith and not by any means forbidden by law. *See* 11 U.S.C. § 1325(a)(3) (West 2000). The central inquiry for the Court is the Debtor's alleged lack of good faith, and the Court does not focus on any allegations of the Debtor's bad faith as bad faith is not mentioned in § 1325. The burden of proof to establish that a plan is proposed in good faith is on the debtor. *See In re Petersen,* 228 B.R. 19, 24 (Bankr.M.D.Fla.1998). A debtor's burden further increases if a Chapter 13 "superdischarge" is sought. *Id.*

■ In addressing whether a debtor has proposed a plan in good faith, this Court applies a totality of the circumstances test. The Eleventh Circuit in *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens),* 702 F.2d 885 (11th Cir.1983), delineated eleven factors that courts should consider in determining a debtor's good faith under 11 U.S.C. § 1325, including:

(1) the amount of the debtor's income from all sources;

---

**7.** Although not raised, the Court recognizes the separate issue of whether statutory rates of interest constitute true interest or provide for a penalty. *See In re Liuzzo,* 204 B.R. 235 (Bankr.N.D.Fla.1996) (reviewing caselaw dealing with this issue); *In re Koger Properties, Inc.,* 172 B.R. 351 (Bankr.M.D.Fla.1994) (holding that the 18% interest rate in the Florida Statute is in the nature of a penalty). The Court favors the reasoning in *Liuzzo* that the statutory rate does not constitute a penal-ty. The *Liuzzo* Court also raises equitable considerations that are not applicable in this case. *See Liuzzo,* 204 B.R. at 240–41 (noting that statutory rate can be disregarded for equitable reasons).

**8.** *See Hollinger,* 245 B.R. at 696 (using this argument to support application of formula method).

(2) the living expenses of the debtor and his dependents;

(3) the amount of attorney's fees;

(4) the probable or expected duration of the debtor's Chapter 13 plan;

(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

(6) the debtor's degree of effort;

(7) the debtor's ability to earn and the likelihood of fluctuation in his earnings;

(8) special circumstances such as inordinate medical expense;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;

(10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; and

(11) the burden which the plan's administration would place on the trustee.

*Id.* at 888–89. As with any totality of the circumstances test, no one factor will dispose of the issues of this Case. Rather, the Court must consider all of the circumstances surrounding the Debtor's pre-petition activity and the filing of the Case.

■ Congress enacted Chapter 13 to provide a highly desirable method for dealing with the financial difficulties of individuals. *See Jim Walter Homes, Inc. v. Saylors (In re Saylors)*, 869 F.2d 1434, 1436 (11th Cir.1989) (quoting H.R.Rep. No. 193, 86th Cong., 1st Sess. 2 (1959)). Chapter 13 creates an equitable and feasible way for the honest and conscientious debtor to pay off his debts rather than having them discharged in bankruptcy. *Id.* The Eleventh Circuit further stated that "[t]he good faith requirement of 11 U.S.C. § 1325(a)(3) is sufficient to prevent undeserving debtors from using this procedure, yet does not prevent deserving debtors from using the procedure." *Id.* For the reasons provided below, the Court finds Debtor undeserving of the chapter 13 procedure.

■ In determining whether a bankruptcy petition is filed in bad faith, the Eleventh Circuit has stated that the bankruptcy court should consider "the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13". *Kitchens*, 702 F.2d at 889. Presumably, Debtor's motivation is to save his business. However, Debtor's sincerity is questionable based on his degree of effort in this case and previous cases, which is a strong factor in this Court's decision. This is Debtor's third Chapter 13 case, Debtor has continually been behind in making his payments to the Chapter 13 Trustee, and Debtor was $11,700.00 in arrears at the June 29, 2000 confirmation hearing.

■ Plan length and the portion of debt to be repaid under a proposed plan are relevant to the determination of good faith. *See In re Petersen*, 228 B.R. at 25–26 (considering payout to unsecured creditors). In this case, Debtor proposes a five-year plan, which at best will distribute less than eight percent (8%) of his unsecured debt. Unsecured Creditors claim that payout under Debtor's plan will be closer to two percent (2%). While a small payout alone is not determinative of lack of good faith, it is an additional factor that courts must consider. *See In re Clements*, 185 B.R. 903, 907 (Bankr.M.D.Fla.1995) (noting that small payouts in Chapter 13 cases deserve particular scrutiny). If Debtor's proposed plan were confirmed, Debtor would retain an interest in over-encumbered non-exempt business property at the expense of his unsecured creditors. Such treatment of unsecured creditors does not support Debtor's position that his Third Amended Plan was proposed in good faith.

■ Type of debt sought to be discharged and whether such debt is nondischargeable in Chapter 7 are relevant to the consideration of whether a debtor has proposed a Chapter 13 plan in good faith. *See In re Petersen*, 228 B.R. at 26 (citing *In re LeMaire*, 898 F.2d 1346, 1349 (8th

Cir.1990)). A Chapter 13 plan serving no purpose other than the discharge of an otherwise nondischargeable debt by a debtor not in need of Chapter 13 relief should be denied for lack of good faith. *See Id.* (citing *Ohio Student Loan Comm'n v. Willis,* 24 B.R. 293, 294 (Bankr.S.D.Ohio 1982); *In re Bloom,* 3 B.R. 467, 472 (Bankr.C.D.Cal.1980)). While Debtor certainly has debts that would be dischargeable in a Chapter 7 case, the Court received credible evidence that a large portion of Debtor's unsecured debt may be nondischargeable in a Chapter 7 case. While this Court does not have reason to determine the dischargeability of the Unsecured Creditors' claims, the Court finds some support in the possibility that these debts may be nondischargeable in a Chapter 7 case.

■■■ The feasibility of Debtor's plan is certainly at issue, as well as Debtor's ability to earn and the likelihood of fluctuation in his earnings. Debtor's schedules and the evidence presented do not indicate that Debtor's plan is feasible. Debtor lists disposable income of $3,932.00 per month, yet Debtor's most recent Chapter 13 plan proposes monthly payments ranging from $4,700.00 to $6,000.00. Debtor failed to present any credible evidence that he would earn enough to cover these plan payments. Rather, Debtor testified that summer was a good time for business. The corresponding decrease in business revenue after the summer boating season does not support feasibility of Debtor's plan. Under the current proposed plan, Debtor's payments increase substantially just as his projected business revenues taper off.

Additionally, Debtor's Chapter 13 plan proposes repayment of Tax Collector's secured tax claim in the amount of $30,-257.70, but, as discussed herein, does not provide for interest on this claim at the "current market rate." Nevertheless, had Debtor provided for payment of Tax Collector's claim at the "current market rate" of interest in his plan, either unsecured creditors would receive less distribution or Debtor's monthly plan payments would further exceed his listed disposable income.

The Court takes consideration of Debtor's injuries. Debtor testified that injuries kept him from work and created a loss of income. Nonetheless, the crux of Chapter 13 is making payments under a proposed plan. In the majority of Chapter 13 cases, this Court has great tolerance for debtors as long as plan payments are timely made and debtors remain current in their plan payments. Additionally, had this been Debtor's first filing, the Court would be more lenient. But Debtor appeared at confirmation in his third Chapter 13 case with a substantial arrearage and no real evidence that his plan was feasible.

### CONCLUSION

After considering the totality of the circumstances, the Court concludes that Debtor did not propose his plan in good faith as required by 11 U.S.C. § 1325. Debtor's continuous delinquency in making plan payments, large arrearage, the lack of evidence that Debtor's Third Amended Chapter 13 Plan is indeed feasible, and the other factors discussed herein do not support confirmation. Additionally, based on the foregoing discussion and analysis, the Court concludes that the "coerced loan" approach is the proper method of determining the "current market rate" of interest, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), in Chapter 13 cramdown cases. Despite being moot based on denying confirmation, the Court finds that the appropriate "current market rate" of interest in the instant case would be eighteen percent (18%).

The Court will enter an order in accordance with these Findings of Fact and Conclusions of Law.