In re Carl L. SENIOR, Jr. and Pe-
trease L. Senior a/k/a Padres
Manning, Debtors.

No. 00–333–3F3.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Dec. 1, 2000.

D. Lamar Smith, Jacksonville, FL, for Debtors.

Lance Paul Cohen, Jacksonville, FL, for WFS Financial, Inc.

Mamie L. Davis, Jacksonville, FL, Chapter 13 Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court for confirmation of the Second Amended Chapter 13

Plan filed by Carl L. Senior, Jr. and Petrease L. Senior ("Debtors") on July 18, 2000. (Doc. 39.) On August 9, 2000, WFS Financial, Inc. ("WFS") filed an Amended Objection to Confirmation of Debtors' Plan on the grounds that Debtors' Plan failed to provide a proper market rate of interest on WFS' claim and failed to provide for any payment to WFS during the first eight months of the Plan. (Doc. 44.) On October 17, 2000, the Court held a confirmation hearing at which the parties presented evidence and argument as to the proper measure of the market rate of interest. The Court elects to publish its findings as to the proper market rate in this case in order to hopefully limit litigation on interest rate issues in the future and provide consistency and predictability in the Chapter 13 cram-down process.

### FINDINGS OF FACT

On June 1, 1999, Debtors purchased a 1994 Acura Legend four-door sedan. Debtors agreed to pay a total of $37,916.34 for the vehicle—$22,948.28 in principal and $14,968.06 in interest at 19.89% annually. (WFS' Ex. 1.) This worked out to a monthly payment of $574.49.

WFS financed the purchase and received a purchase-money security interest in the vehicle as collateral for the loan.

Debtors testified at the confirmation hearing that the vehicle now has about 80,000 miles on it.

On January 18, 2000, Debtors filed their Chapter 13 petition in this Court. (Doc. 1.) Debtors had not filed for Chapter 13 protection anytime in the last six years.

Debtors' Summary of Schedules indicated $321,925.00 in assets and $340,380.01 in liabilities. Debtors valued the Acura at $13,875.00 and WFS' claim at $19,000.00, leaving $5,125.00 of WFS' claim unsecured.

Debtors proposed a fifty-three month Plan. The Plan provided that WFS receive $363.10 per month in distribution. Debtors came up with this number by adding 8% interest to their estimate of WFS' secured claim, $16,275.00, over forty-five months of payments to be made from month eight to month fifty-three of the Plan.

The remainder of WFS' claim, $7,322.00, would be paid off pro rata with the rest of the unsecured claims. The Plan provided that the unsecured creditors receive 21% of their claims.

WFS contends that Debtor's Plan does not satisfy the requirement that a debtor's plan provide a secured creditor property amounting to the full present value of a secured claim pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii). More specifically, WFS argues that the "market rate" of interest required to bolster a deferred secured claim payout to present value must be closer to the contract rate of interest that a creditor would have earned on the money by loaning it to a similarly risky consumer outside bankruptcy.

Debtors, of course, argue that 8% interest compensates WFS sufficiently for the inconvenience of having its profit slashed and dragged out over fifty-three months.

Such disputes have become alarmingly typical and theoretically intractable. There is currently no effective substantive or procedural device able to pragmatically conduct the necessary balancing between a creditor's profit interest and a debtor's reorganization interest.

The Court, therefore, finds that some definite, numerical guidelines must be imposed in order to bring order and simplicity to this arena. First, the Court will analyze the interest-rate computation methods currently in place. Then, the Court will establish presumptively valid interest rate parameters dependent on the length of a proposed plan. Finally, the Court will add a list of factors to be considered in departing from those guidelines, and will offer three exceptions to the application of these standards.

## CONCLUSIONS OF LAW

### I. THE REQUIREMENT OF PRESENT VALUE PAYMENT UNDER § 1325(a)(5)(B)(ii) AND CURRENT METHODS FOR DETERMINING THE CORRECT PRESENT VALUE RATE

■ Section 1325(a)(5) provides, in relevant part:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(5) with respect to each allowed secured claim provided for by the plan—

(B)(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim ...

11 U.S.C. § 1325(a)(5)(B)(ii) (2000). Secured creditors must be accorded full present value of their claims in exchange for being forced to accept deferred payment and for losing any rights against the collateral during a plan. *See United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.),* 709 F.2d 647 (11th Cir.1983) (addressing the present value requirement of 11 U.S.C. § 1129(a)(9), a cram-down provision analogous to § 1325(a)(5)(B)(ii)).

The Eleventh Circuit declared rather cryptically in *Southern States* that creditors who are forced to receive deferred payments in lieu of contractual payments or collateral foreclosure should receive interest on the secured portions of their claims at the prevailing market rate. *See Southern States,* 709 F.2d at 652–653. Left to their own devices in determining exactly what "market rate" means, bankruptcy courts in Florida have split between two approaches: the "formula" method, a debtor darling that generally produces lower interest rates, and the "coerced loan"

method, whose very appellation hints at its appeal to creditors.[1] *See e.g. In re Hollinger,* 245 B.R. 691 (Bankr.N.D.Fla.2000) (discussing the merits of the two methods and electing to employ the formula method); *In re Felipe,* 229 B.R. 489, 491–492 (Bankr.S.D.Fla.1998) (adopting the coerced loan method); *In re Star Trust,* 237 B.R. 827, 841–842 (Bankr.M.D.Fla.1999) (adopting the coerced loan method).

■ This Court adopted the "coerced loan" approach just three months ago in *In re Haskell,* 252 B.R. 236, 242 (Bankr. M.D.Fla.2000). The Court found that, in determining the proper Chapter 13 cramdown interest rate, the Court must look to the interest rates charged for making a loan with similar terms, duration, collateral, and risk. *See id.* In effect, the coerced loan method obligates the parties to produce evidence as to the sort of interest rate a financier would charge for a loan to a consumer with a history of default and bankruptcy secured by collateral that cannot be foreclosed without venturing into a bankruptcy court. *See id.* The Court recognized that no actual market exists for these loans outside the confines of hospitals for the insane. *See id.* Apparently, the Court found that the proof problems inherent in requiring that parties provide evidence defining the contours of this financial fantasyland were less onerous than the problems of judicial economy created by the formula method, which is tailored for more complex Chapter 11 cases and requires extensive and time-consuming evidentiary overkill in the Chapter 13 context. *See id.*

### II. ELABORATION ON THE "COERCED LOAN" METHOD

Practitioners have either failed to absorb the implications of the "coerced loan"

---

1. Five circuits have wisely chosen to foreclose bankruptcy court's meanderings by explicitly adopting the "coerced loan" method. *See Green Tree Fin. Serv. Corp. v. Smithwick (In re Smithwick),* 121 F.3d 211 (5th Cir.1997); *GMAC v. Jones,* 999 F.2d 63 (3d Cir.1993); *United Carolina Bank v. Hall,* 993 F.2d 1126, 1131 (4th Cir.1993); *Hardzog v. Federal Land Bank (In re Hardzog),* 901 F.2d 858 (10th Cir.1990); *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982).

method or have disregarded its adoption entirely.[2] Debtors continue to propose the industry-standard 8% interest rate and creditors continue to insist on the 18% Florida maximum rate or on higher contract rates.

The Court finds that the adoption of the "coerced loan" method has not fended off chaotic debate on the proper cram-down interest rate to be applied in Chapter 13 cases as hoped. The Court finds that further elaboration on the "coerced loan" method is necessary in order to bring more consistency and predictability to the Chapter 13 cram-down process.

Therefore the Court elects to adopt a more rigid formula for the determination of the proper interest rate under § 1325(a)(5)(B)(ii) and *Southern States* with the hope that debtors' attorneys can be sure of plugging an unobjectionable interest rate into their debtors' plans. Rather than continuing to rely on the parties to present evidence of a nonexistent market, the Court will establish clear parameters for that market and will provide a non-inclusive list of factors to be considered in fine-tuning the cram-down interest rate.

### A. Step one: determine the proper cram-down interest rate range according to the length of the proposed plan

■ The first step in determining a proper cram-down interest rate is tagging the plan within a rate range determined by the length of the plan.

■ The Court finds that the proper cram-down interest rate to be paid out on a secured claim over the life of a three-year plan should fall between 9% and 13%. The Court finds that the proper cram-down interest rate to be paid out on a secured claim over the life of a plan longer than three years may vary between 11% and 15%.

**2.** Or perhaps their copy of Bankruptcy Re-

■ The interest rate rises as the plan stretches because the benefits of bankruptcy to a debtor, and the corresponding detriments of bankruptcy to a secured creditor, increase with the length of a plan. A debtor extends a bankruptcy court's procedural and substantive protection from state court lawsuits, repossession, and default. The interest rate paid to the creditor does not compound and late payment fees cannot be added to interim payments set at confirmation, both effects multiplied by the length of a plan. A debtor reduces his monthly payments even further below the contractual payment. Essentially, a debtor is shielded from the cruel, cruel world of debtor/creditor contract law by the protective wing of a bankruptcy court, and a creditor is left waiting up to five years for a deferred full payout of its secured claim and for a paltry pro rata payout on its unsecured claim. A high interest rate is a small price to pay for a debtor to receive these benefits. And it is not unreasonable to raise the interest rate even higher if a debtor elects to partake of bankruptcy's bountiful bonuses for longer than three years.

### B. Step two: adjusting the interest rate to fit the particular case

■ In fine-tuning the interest rate, the Court will take into account any relevant factors, including, but not limited to,

1. The percentage of a creditor's total claim that is secured by collateral as valued;

2. The percentage of a creditor's unsecured claim to be paid out through pro rata distribution;

3. The age and condition of the collateral at the petition date;

4. The number of prior cases filed by a debtor, whether those cases were dismissed pre- or post-confirmation, and whether a debtor made any payments under those plans;

porter Volume 252 is still in the mail?

5. Whether a debtor has consistently maintained insurance on the collateral;

6. The proximity of the date that the debt was incurred to the petition date.

The Court reiterates that the above list is not exhaustive of the factors it will consider in adjusting cram-down interest rates.

■ The Court notes that garden-variety Chapter 13 plans will not be adjusted. Only plans whose length-based interest rate fails to reflect a unique risk to a creditor or unique indices of creditworthiness of a debtor will be adjusted to a rate outside the range proper for a plan of that particular length. The Court has in mind cases where a debtor's plan borders on bad faith, or where the collateral has some intrinsically immeasurable or speculative value, for example.

### C. Exceptions to the application of these guidelines

The Court adds three caveats to the guidelines here established.

■ First, as a matter of policy, the Court will approve any post-petition outside financing for collateral that a debtor can obtain at an interest rate that results in a lower monthly payment than that deemed proper for a debtor's particular plan under the above guidelines. For example, if a debtor qualifies for a cram-down interest rate of 13% and must pay a monthly disbursement of $200.00 on a secured claim at 13%, then the Court will approve any post-petition financing that results in a monthly disbursement of less than $200.00 per month on the collateral. In other words, the Court's hypothetical determination of the imaginary "coerced loan" market yields to any real-life interest rate a debtor can obtain that results in a lower monthly disbursement on the collateral.

■ Second, the Court will generally not afford to a secured creditor a cram-down interest rate greater than the rate provided for by the original financing contract. Again, the Court finds that interest rates from the real world trump the interest rates prevalent in the hypothetical "coerced loan" market.

■ Finally, the Court will not impose these guidelines on interest rates not brought to it in dispute. The Court will almost certainly approve cram-down interest rates agreed to by a debtor and a secured creditor. The Court will also look kindly upon proposed cram-down interest rates not specifically objected to by a secured creditor.

### III. APPLICATION TO THE INSTANT CASE

First, the Court finds that the appropriate interest rate range for a secured claim cram-down over a fifty-three month Plan is 13% to 15%.

The Court will now address the adjustment factors listed as they apply to the instant case.

■ WFS' claim is fairly well secured, but not secured enough to mandate dropping the cram-down interest rate. Of debtor's total indebtedness to WFS, $23,597.00, about 69%, or $16,275.00, is secured.

WFS will receive a healthy (read: more than nominal) pro rata payout on its unsecured claim, but not a sufficiently high payout to justify dropping the cram-down interest rate. WFS will receive 21% of its unsecured claim, $7,322.00, through pro rata distribution.

■ The collateral is not old enough or worn enough to justify raising the cram-down interest rate. The Court notes that the collateral condition adjustment factor applies to collateral whose age and decrepitude may lead to a precipitous drop in the collateral's value early on in a plan—collat-

eral on the verge of falling apart soon after confirmation.

Debtors have not filed for bankruptcy protection in the last six years. Therefore the cram-down interest rate may not be adjusted upwards to account for serial filings or prior failure to comply with the Chapter 13 regime.

There is no evidence indicating that Debtors have at anytime failed to insure the vehicle, thus increasing the risk that they may do so in the future.

Debtors did not purchase the vehicle close enough to the petition date to mandate adjustment of the interest rate to reflect their intent to buy the car with reorganization in mind. Additionally, the purchase was not close enough to the petition for the contract rate to approximate a market interest rate for a loan to a bankrupt. Debtors purchased the vehicle seven and one-half months before filing for bankruptcy. Few Chapter 13 debtors are so cunning as to plan for bankruptcy two weeks before petitioning, let alone seven months. Additionally, there is no evidence that Debtors' financial troubles had begun seven months ago—there is no evidence that bankruptcy was on Debtors' minds, or affected the contract interest rate, when the vehicle was purchased.

The Court finds it relevant that Debtors' Plan provides that WFS will receive nothing in the first eight months of the Plan. This provision sufficiently exposes WFS to heightened risk to justify raising the proper market interest rate to 15%. Debtors could effectively drive WFS' collateral around for eight months without paying and subsequently dismiss their case, having received eight free months of vehicle use and diminishing the vehicle's value without any consideration for WFS.

Therefore, the Court finds that the appropriate "coerced loan" market interest rate to be added to WFS' secured claim in order to bolster it to present value over the life of the Plan is 15%.

The Court's determination of a hypothetical "coerced loan" market rate will not apply if a debtor can acquire post-petition financing to buy out a secured creditor at a lower payment or if the Court's determination of the proper coerced rate is greater than the original contract interest rate.

None of the exceptions to application of these guidelines applies to the instant case. Debtors did not assert that they could obtain an actual coerced loan that would lower their monthly disbursement on the collateral. Additionally, the financing agreement between Debtors and WFS provided for a 19.89% interest rate, well above the Court's 15% determination. Obviously, the parties have not agreed to the rate in the Plan and the secured creditor has filed an objection on cram-down interest rate grounds.

Therefore, the Court's determination of the hypothetical market rate of 15% stands. If Debtors' Plan provides for that interest bump or better, then the Plan may be confirmed.

The Court will not confirm Debtors' Plan because it only provides for an 8% cram-down interest rate, well below the 15% market rate established by the Court. The Plan thus fails to provide WFS with the full present value of its secured claim as required by § 1325(a)(5)(B)(ii).

## CONCLUSION

The Court establishes a three-part formula to determine the proper interest rate to be added to a secured claim in order to guarantee the secured creditor present value over the life of a plan. The Court employs these new guidelines and finds that the proper market interest rate to be added to the secured creditor's claim in the instant case is 15%. The Court finally concludes that Debtors' Plan cannot be confirmed as it stands because it does not provide for a sufficient cram-down interest rate on WFS' secured claim to satisfy § 1325(a)(5)(B)(ii). The Court will sustain WFS' Objection to Confirmation.

The Court will enter a separate Order in accordance with these Findings of Fact and Conclusions of Law.